Argued July 15, affirmed October 30, petition for rehearing
denied November 18, 1959

# LARSON *v.* HEINTZ CONSTRUCTION COMPANY ET AL

345 P. 2d.835

*Paul W. Haviland* and *Hugh B. Collins,* Medford, argued the cause and filed the briefs for appellant.

*Robert T. Mautz* and *Earl F. Bernard,* Portland, argued the cause for respondents. With them on the briefs were David Sandeburg and Merwin Rankin, Portland.

Before Lusk, J., presiding, and Rossman, Warner and O'Connell, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff, Lucile Larson, from a judgment which the circuit court entered in favor of the defendants, five in number. The defendants Heintz Construction Co. and Warren Northwest, Inc., are corporations which construct highways. The defendants Charles Heintz and Myron W. Ryan constitute a partnership which rents roadbuilding equipment, such as motor trucks, to contractors. The fifth defendant is Billy Wayne Phillips who, at the time the plaintiff sustained the injury which underlies this case, was the driver of a motor truck belonging to the partnership and was returning to a gravel dump for a load of crushed rock to be used in roadbuilding. Although the matter is not free from controversy we shall deem, for the purposes of convenience, that Phillips was in the employ of the defendant Heintz Construction Co. The plaintiff's (appellant's) brief states that "the vicarious liability is not involved in this appeal." After all parties had rested and the defendant Warren Northwest, Inc., had moved for a directed verdict the trial judge ruled that the motion should be granted; but at the request of the plaintiff and pursuant to ORS 18.140 submitted the case to the jury as to all of the defendants with leave to the defendant Warren Northwest, Inc., to move for judgment in its favor if the jury returned a verdict for the plaintiff. The verdict was in favor of the defendant Phillips, which the parties, under the instructions given to the jury, treat as a verdict for all of the defendants.

While riding in an automobile which her husband, Ray B. Larson, was operating the plaintiff sustained injury when the car came into contact with a truck owned by the defendants Heintz and Ryan which was driven by the defendant Phillips. In this action the

plaintiff seeks the recovery of damages for the injury thus sustained. The highway upon which the accident took place was under construction. The plaintiff contends that the defendants Heintz Construction Co. and Warren Northwest, Inc., were performing the construction work as a joint venture. She alleged that all five defendants were responsible for the operation of the truck and that it was driven in a negligent manner. After this appeal was taken it was dismissed upon stipulation as to the defendant Warren Northwest, Inc. Hence, this case no longer affects that party. Owing to that fact we may hereafter refer to the Heintz Construction Co. as the road building contractor although we realize that dismissal of the appeal did not determine the controversy as to which of the two road building defendants was responsible for some of the phases of the undertaking in issue.

The plaintiff submits eight assignments of error. The first charges error upon an order which struck from the complaint paragraph V. The second predicates error upon an order which denied the plaintiff's motion to withdraw from the jury's consideration an affirmative defense submitted in the answer of the defendant Warren Northwest, Inc. The fourth and fifth make similar claims as to defenses submitted by the answer of Phillips and by the answer of Heintz and Ryan. The third challenges a ruling which denied the plaintiff's objection to a question submitted to defendants' witness Roy E. Lake. The sixth and seventh challenge instructions given to the jury. The eighth complains because the plaintiff's motion for a new trial was overruled.

September 12, 1952, at about 4:45 p.m. the plaintiff's husband was driving the Larson car northerly upon Highway 97 at a point between Crescent and Gilchrist. The plaintiff was seated to his right in the

front seat and to her right a friend of the Larsons, Mrs. Mary Brown, was seated. The motor truck driven by the defendant Phillips, to which we have referred, was ahead of the Larson car and was going in the same direction as it. The accident occurred when the car sought to overtake the truck. The roadway, 22 feet broad, was dry, straight and level. The weather was clear and warm. Although about 10 miles of the road was under construction, the segment where the accident occurred was complete apart from the fact that the crushed rock shoulders had not been placed and a yellow line, marking the center of the pavement, had not been painted.

To the left of a motorist traveling north a quarry road 18 feet broad entered Highway 97 at a point near the place where the accident was destined to take place. That road which was only a few hundred feet long led into a place where a rock crusher was operating, a pile of crushed rock was kept and some appurtenant activities were conducted. As he approached the quarry road Phillips intended to turn to his left and enter it.

Phillips, as an adverse witness called by the plaintiff, testified that when he drew within about 300 feet of the quarry road he glanced into his rear-view mirror and saw a car about 500 feet to his rear. It was the Larson car, although Phillips was unaware of its identity and unacquainted with the Larsons. There were no other cars within sight either in front or behind. When Phillips observed the car behind he prepared to make a left turn into the side road. According to him, he gave a signal with his left arm announcing an intention to turn to the left and changed his course so that his truck crossed the unmarked center of the pavement until his left wheels were 5 feet beyond the center. Then he righted his course

and neared the quarry road with his truck running virtually parallel with the edges of the pavement but with his left wheels 5 feet beyond the center of the road. His truck, if his impression was accurate, was 7½ feet wide. Accordingly, if his left wheels were 5 feet left of the center there was upon that side of the road only 6 feet of unoccupied space, but upon the right half there were 9 feet free for other users. He also swore that since his truck was well over the left side there was no further need for maintaining a signal and pulled in his arm. By that time he had reduced his speed, so he estimated, to 15 miles per hour.

Phillips swore that when the truck was in the position just mentioned and was about to turn into the side road the Larson car, traveling at a very fast rate of speed, drew close to the truck's left side and then side-swiped it. He testified that the car had given no signal whatever. According to him, the Larson car tore from the truck its left running board and upon coming into contact with the left two feet of the truck's heavy front bumper bent that part from a turn to the rear into one straight ahead.

The unchallenged evidence indicates that the left wheels of the Larson car, while the latter was attempting to pass the truck, left the pavement and threw up a cloud of dust. Shortly the car overturned, but before coming to rest righted itself. When it stopped it was in a ditch 162 feet and 4 inches from the point of impact. In the car's uncontrolled movements the plaintiff and Mrs. Brown were thrown from it.

Mr. and Mrs. Lewis Lynn, who reside in Prineville, were driving from Prineville to Alturas, California, when this accident happened. Both, as witnesses for the plaintiff, testified that as they neared

Crescent they saw a cloud of dust rise from the roadway and upon arriving at its place of origin saw the truck, the wrecked Larson car and two women lying on the ground unconscious. Mr. Lynn noticed no other car at that place when he reached it, and, according to him, none arrived at the place until five or ten minutes had passed. Mrs. Lynn gave similar testimony. The defendants claim that Mr. Larson drank intoxicating liquor prior to the accident and that he was under its influence. Mr. Lynn testified that upon arriving at the scene of the disaster he noticed that Larson was still in his car and engaged him in conversation. While so doing he wiped blood from Larson's face. He swore that he smelled no liquor upon Larson's breath and noticed no sign of intoxication. Mrs. Lynn likewise observed no indications of intoxication.

Fay A. Holley, a sergeant in the State Police, came to the scene of the accident about twenty minutes after it had occurred. By the time that he reached the scene other people were there and thereupon he asked each one whether he had seen the accident occur. All replied in the negative. Among those who were present when Holley made his inquiries was an individual by the name of Roy E. Lake to whom we will later refer again. Lake helped Holley make some measurements. We take the following from Holley's testimony in which his reference is to Larson:

"Q And in connection with your conversation with him did you observe him closely?
"A Yes, sir. I talked to him and took notes.

"Q Did you observe any odor about him of any alcoholic beverages?
"A Yes, sir.

"Q In connection with your observation of him would you state whether or not there was any other

indication about his actions that he had had anything to drink?

"A  No, sir.

\*    \*    \*

"Q  You mentioned that you detected the odor of liquor on Mr. Larson's breath.  Was it quite evident?

"A  I could smell it, sir.

"Q  You had no difficulty in smelling it?

"A  No, sir."

Mr. Holley also testified that he detected the odor of liquor upon the breaths of the two women.  The following is quoted from his further testimony:

"Q  What did you find in the Larson car at the scene in the way of beer or whiskey or containers thereof?

"A  I found two Budweiser beer cans.

"Q  Empty or full?

"A  Empty.  And a broken Sunny Brook bottle.

"Q  And what else?

"A  There was two other bottles that came into my possession, and I can't testify to whether they were in the car or—it seems to me someone gave them to me.  I never noted it.

"Q  Was one of those bottles full?

"A  One was full and one was partially empty.

"Q  Would you refer to your notes and tell us, Officer, of the degree of fullness, if your notes show, as to the other one?

"A  It was only about a quarter full.

"Q  But two were identified by you as being from the Larson car, were they?

"A  They were handed to me by some person, I am quite sure.  Who it was, I can't testify, and they said that they were from that car.

"Q  Is it not a fact, Sergeant, that your recollection, as of the time you made your notes, was that you found them in the Larson car?

"A  That's correct.

"Q  That is what your notes show?
"A  That is what my notes show."

Larson, as a witness for his wife (the plaintiff), testified that when he and Mrs. Larson prepared upon the morning of the accident to leave their home in Medford for a vacation trip he put in his car two bottles of whiskey, one of which was completely full and the other about three-quarters full. When his car reached Prospect, a community 90 miles from the scene of the accident, Larson, so he swore, went into a store and purchased six cans of beer. He denied that any of the party drank any of the whiskey after leaving Medford, but testified that he drank two of the cans of beer and that the two women drank three of them. Larson testified that before he undertook to pass the truck he gave a signal with his horn and that the truck was then upon the right half of the pavement. He further testified that when the front of his car was two feet or more ahead of the truck the latter, without giving any signal, turned to its left into his car. He estimated his speed at about 50 miles an hour when he undertook to pass the truck.

Roy E. Lake, aforementioned, a witness who was called by the defendants Heintz and Ryan, testified that he was an employee of the State Highway Commission charged with the responsibility of seeing to it that the highway construction work which we have described was done in conformity with the applicable specifications. The record imputes to him no interest in the parties or the case. He testified that at the time of the accident he was on his way to the quarry road and was traveling in the same direction as the truck and the Larson car. He was behind the truck but head of the Larson car. He estimated his speed at 70 miles an hour. According to him, he was passed

by the Larson car when he had reached a point about a half mile from the side road. He thought that the Larson car was traveling "at approximately 80 or 85 miles an hour." At that time he did not know the identity of the driver of the Larson car. Shortly after he had been passed he observed ahead a cloud of dust arise from the left shoulder of the roadway and upon coming to the place from which the cloud of dust emanated saw the truck standing upon the highway and the Larson car in the ditch. Lake said that he did not see the two vehicles at the moment of impact. Larson was in his automobile when he (Lake) reached the scene of the disaster and, according to Lake, was "taking a couple of bottles of liquor from his vehicle." He swore that Larson concealed the liquor "behind a small log" near the side of the road. He added that when Sergeant Holley came to the scene he told Holley about the liquor. Lake claimed that apart from Phillips and the three occupants of the Larson car he was the first person who came upon the scene of the accident.

Although the above is a scant review of the record which covers approximately 700 typewritten pages, it will suffice for present purposes to enable us to dispose of the assignments of error. We will, however, add some details later.

The first assignment of error is directed at the striking of Paragraph V from the complaint which pleaded a contract between the state and "each and all of the defendants except Billy Wayne Phillips" for the construction project on which the plaintiff suffered injury. One of its provisions follows:

"The contractor shall be responsible for all damages to property, injury to persons, and loss, expense, inconvenience and delay that may be caused by or that may result from the carrying out of the work to be done under this contract or from any

act, omission or neglect of the contractor, his sub-contractors or his employees."

The covenant more immediately in question, which plaintiff contends was inserted "for the benefit of travelers on the highway" reads as follows:

"BARRICADES, WARNING SIGNS AND FLAGMEN. The contractor shall at his expense and without further or other order provide, erect and maintain at all times during the progress or temporary suspension of the work suitable barricades, fences, signs or other adequate protection, and shall provide, keep and maintain such danger lights, signals and flagmen as may be necessary or as may be ordered by the engineer to insure the safety of the public as well as those engaged in connection with the work. All barricades and obstructions shall be protected at night by signal lights which shall be suitably distributed across the roadway and which shall be kept burning from sunset to sunrise. Barricades shall be painted black and white in diagonal stripes to increase their visibility at night.

"The contractor's responsibility for the safeguarding of traffic as specified above shall cease when the work included in the contract is accepted as complete.

"The failure of the engineer to notify the contractor to maintain barriers, lights, signals or flagmen shall not operate to relieve the contractor from his responsibility."

It is plaintiff's theory that the demands of this contract clause were to warn employees of the construction companies and travelers on the highway to exercise extra caution while in the construction zone. The stricken paragraph charged, and evidence excluded on the trial would have shown, that no warning signs or flagmen were placed at the entrance to the quarry road.

If the plaintiff is correct in her contention that striking the paragraph constituted error, then the judgment must be set aside. It is obvious that the defendant contractors were not, in the absence of this contract and of evidence showing violation of its terms, charged with a duty of placing warning signs or flagmen at access roads if their truck drivers were in a position to obey the ordinary rules of the road. The case as submitted to the jury required a finding that Phillips was negligent in order to charge the defendant contractors. If this contract created a duty to the plaintiff, the contractors might have been charged with negligence even though Phillips was exercising due care. The verdict of the jury, in favor of the defendants, was general. We do not know whether is was predicated upon Phillips' lack of negligence, or upon contributory negligence of the plaintiff.

The problem in brief is whether this contract, to which the plaintiff was not a party, set up a "standard of care" superseding the common law standard of reasonable care which the plaintiff can plead against a party to the contract for recovery of tort damages. If it did, then we must also decide whether the application of this contract was a matter for the jury.

The authorities, rather sizeable in number, are divided sharply—some holding that the plaintiff may set up the contract, others that it must be excluded. They generally are in agreement that the law to be applied is that of third party beneficiary contracts and that the contract controls only if the plaintiff is a primary and not an incidental beneficiary.

Public contract not admissible.

First we will consider the cases which hold that the contract may not be pleaded. *Wymer-Harris*

*Construction Company v. Glass,* 122 Ohio St 398, 171 NE 857, 69 ALR 517 (1930) is a leading case for that proposition. The plaintiff's decedent was killed by an automobile while he was walking on a viaduct where reflooring work was being carried on by the Wymer-Harris company under contract with the board of county commissioners. The automobile was traveling north on the viaduct although traffic in that direction was supposed to be halted. The contract required that appropriate traffic guards and signals should be maintained by the company. Apparently this was not done, but plaintiff's attempt to introduce the contract was defeated. The court rejected it on the ground that the county, enjoying sovereign immunity, could not properly enlarge the duty of those with whom it contracts beyond the duty of reasonable care already fixed on them by law. The opinion raises some important questions.

"So we conclude the rule to be that the duty owing toward the public by a contractor in the performance of public work cannot be increased by a contract with a public official, as such, beyond the sum of the legal duty of such public official toward the public and the legal duty of the contractor toward the public; that a public official, in making a public improvement by contract, because of the necessity of surrendering a measure of control to his contractor, has the implied power, where not expressed, to contract with such contractor to save him in his official capacity harmless, and may by contract provide a reasonable manner and means of accomplishing that end, and may enforce such contract. But since the duty he in his official capacity owes to the public is the duty the political subdivision, of which he is an officer, owes to the public, he can neither increase nor diminish that duty by contract. The obligation of the subdivision to respond to a member of the public for the negligence of its public official is

created by statute and is subject to modification only by legislation.

"If it be claimed that the provisions of the contract in the instant case, imposing upon the contractor a greater duty toward the public than the sum of the duties imposed upon the board of county commissioners in their official capacity by statute and the duty imposed upon the contractor by common law, need not be referable to any existing legal duty of either, but based upon the awarding of the contract as the consideration therefor, then of course the question arises whether the power to purchase extraordinary protection for the members of the public is among powers conferred upon boards of county commissioners; for, whatever the fact may be as to the contractor having or not having included the cost of extraordinary protection to the public in his estimate of the price he could afford to accept for the performance of the contract in the instant case, if we were to hold that the commissioners had such power, future bidders would necessarily be required to include in their estimate of the price at which they could afford to contract to do public work the cost of purchasing indemnity against such extraordinary liability; and the effect of such a holding would be that the board of county commissioners have authority to expend public money to purchase extraordinary protection to persons traveling a particular highway, which of course is not justified by existing legislation."

■ We quote from this opinion at length only to reject it as furnishing a principle that governs our case. The state of Oregon enjoys sovereign immunity by virtue of Article IV, Section 24 of the state constitution as well as at common law. That immunity ought not to be extended to situations where it is not warranted by the constitution or contemplated by the legislature. The state highway commission has been given broad authority to enter into contracts for the construction and maintenance of public highways. ORS 366.400,

366.405. Some of the provisions of public contracts are prescribed by law. See ORS chapters 279 and 375. But the mandatory provisions obviously do not add up to a complete contract. It follows that the highway commission has implied authority to demand other reasonable conditions from contractors in consideration of letting contracts. It is too clear for argument that the safety of the traveling public is a paramount concern of the commission. We think it is within the power of the commission to insist on reasonable precautions for the benefit of travelers even if they are somewhat more stringent than the minimal safeguards of reasonable care prescribed by common law. The standard of care imposed by the contract in question in this case does not rise so much higher than the legally imposed standard as to be open to the attack that it is arbitrary. The standard of reasonable care set by the common law is not fixed and immutable, but is determined by what is reasonable under the facts of each case before the bar.

A number of cases agree with this view. *New York Pneumatic Service Co. v. P. T. Cox Contracting Co.,* 201 App Div 33, 193 NYS 655 (1922), (affirmed in 235 NY 567, 139 NE 737 [1923]), held that the contractor was liable to a third party for failure to observe his contract with the City of New York "although the state or municipality might not be liable to the private individual." See also, *Holland v. G. D. Phillips,* 94 Ga App 361, 94 SE2d 503 (1956), and *City of Austin v. Schmedes,* 270 SW2d 442 (Tex Civ App, 1954).

More commonly the cases do not rest upon want of power in the state to contract, but hold that members of the public are not primary beneficiaries of the construction contract and that the latter is thus immaterial in fixing their rights. This is the settled

rule of New Jersey. The leading case is *Styles v. F. R. Long Co.*, 67 N.J.L. 413, 51 A 710 (1902). The defendant had executed a contract with the freeholders of Passaic County to build a bridge. He was required by its terms to put up a temporary footbridge for the use of pedestrians while the work was in progress. In a separate paragraph, entitled "Protection of the Public," he agreed to "watch and light * * * when necessary" the projects under construction. On a night when the footbridge was unlighted the plaintiff tripped over a step and suffered injuries. The trial court permitted the contract to be introduced, but this was held error on appeal, and a judgment for the plaintiff was reversed. Although a New Jersey statute permitted actions by any person "for whose benefit any contract may have been made * * * notwithstanding the consideration did not move from such person," it was held that the plaintiff could not recover for breach of this contract, since she was no more than an incidental beneficiary. The court said in part:

"We take it to be quite plain that the rule that no one can sue upon a contract unless he is a party to it cannot be evaded by bringing what is really an action for breach of contract in the form of an action of tort. * * *

"The adjudicated cases, as well as the reason of the matter, fully sustain the propriety of exempting one who is employed by a public corporation to perform works for the public benefit, under a contract which imposes a continuing obligation, from an action of tort at the suit of an individual who suffers injury by reason of its nonperformance, so far as such action is based upon the contract itself; the party injured being remitted to his action for breach of such duty * * * as may be imposed upon the defendant independent of the contract. * * *"

The rule was reaffirmed on a second appeal of this case, *Styles v. F. R. Long Co.,* 70 N.J.L. 301, 57 A 448 (1904). In *Lydecker v. Board of Chosen Freeholders of Passaic County,* 91 N.J.L. 622, 103 A 251, LRA 1918D 351 (1918), the plaintiff sued Standard Oil Company for failing to observe the safety provisions of a public contract under which it was oiling county roads. The contract required Standard Oil Company to oil one side of the road at a time and close it to traffic for six hours. The company failed to observe this requirement and plaintiff was injured when his bicycle slipped on the oil. It was held that a member of the public had no cause of action based on this contract. Cf. also *Cochran v. Public Service Electric Co.,* 97 N.J.L. 480, 117 A 620 (1922).

In a Rhode Island case, *Oliver v. Pettaconsett Const. Co.,* 36 R I 477, 90 A 764 (1914), the contract which plaintiff attempted to introduce provided merely that when the defendant found it necessary in the course of the construction work to interfere with passage over highways he was to "provide suitable and safe bridges, or other sufficient crossings for the accommodation of travel on said way." The court rejected the contract on the ground that it had no bearing on the state of facts raised by the pleadings and evidence. It then went on to say that "even if the contract had any relation to the matter of the suit * * * the general rule has been frequently laid down, and so far as we know, without dissent, that such a contract between the defendant and a third party, even where the duty imposed by the contract relates to matters which have a direct bearing upon the injury sustained, will be of no avail to the plaintiff."

In *Prescott v. Collins,* 263 App Div 690, 35 NYS2d 135 (1942), the defendant had contracted with the state

of New York to do work on a barge canal. The contract provided:

"The amount of explosives to be used and the quantity to be kept on hand and the precautions to be taken by the contractor shall at all times and places be such that no damage shall be done to any person or property."

The plaintiffs' decedents, who seemingly were casual visitors to the canal area, were killed by an explosion of dynamite. The appellate division (3rd dept) held that this case was governed by *H. R. Moch Company v. Rensselaer Water Company*, 247 NY 160, 159 NE 896, 62 ALR 1199, and that the contract could not be pleaded. It said:

"Plaintiff's intestates had only an indirect interest in the performance of the contract between defendant and the State of New York. They had only the incidental benefit which every citizen of the State or person who came in the vicinity of the dynamite had in the performance of the contract. For the breach of that contract they have not a private right of action, nor have their administrators."

*United Dispatch, Inc. v. E. J. Albrecht Co.*, 135 W Va 34, 62 SE2d 289 (1950), was concerned with a contract between defendant and the United States for the building of a concrete wall and levee; the contract provided:

"The contractor shall protect all existing structures * * * against damage or interruption of service which may result from the operations of the contractor * * *"

and

"Damage or interruption of service resulting from failure to do so shall be repaired or restored promptly by or at the expense of the contractor."

Those provisions were held not to create a right of action in a building proprietor who suffered property damage as a result of the operations. It must be remembered that the federal government has waived its immunity to tort claims, which makes the argument that such a provision as the above is a mere indemnity clause more persuasive.

*McClendon v. T. L. James & Company,* 231 F2d 802 (CA 5th, La, 1956), held that one cannot sue for breach of a road construction contract calling for warning lights, signals and flagmen unless he is a party to the contract.*

So much for the cases which hold that a member of the public has no right of action on a public contract.

Public contract admissible.

The weight of authority — particularly of recent authority—recognizes in a member of the public a right of action upon a public contract. *City of Austin v. Schmedes,* 270 SW2d 442 (Tex Civ App 1954), held that the plaintiff, injured while driving on a road under construction, could plead a public contract against the defendant contractor. Work on the highway had converted a two lane road into what was in effect a one way road. The contractor failed to put up signs warning of the danger, and plaintiff was injured in a head-on collision. The contract read as follows:

> "The safety of the public and the convenience of traffic shall be regarded as of prime importance during construction. It is the purpose of this

---

* *Davis v. Mellen,* 55 Utah 9, 182 P 920, 7 ALR 1193 (1919), cited in defendant Heintz Construction Company's brief as supporting this proposition, actually looks the other way. The case appears to recognize a right of action in members of the public based on the contract, but holds merely that an agreement to provide a watchman "to protect the work" meant what it said and was not intended to benefit the public. There was no clear evidence that other contract provisions had been violated.

special provision to insure the safety and convenience of the traveling public.

"The Contractor shall provide for the passage of traffic in comfort and safety at all times throughout those sections of the project which are open to traffic at the present time. * * *

"The Contractor shall provide and maintain barricades as indicated on the plans. He shall also provide Class "C" barricades and appropriate signs at any road that is blocked or altered during construction.

"The Contractor shall save harmless the State from all suits, actions or claims brought on account of any injuries or damages sustained by any person or property in consequence of any neglect in safeguarding the work by the Contractor * * *."

The court said that those provisions manifested an intention to give a right of action to the public directly against the contractor for nonperformance of his contractual obligation. On rehearing, as against an argument that these were mere indemnity provisions, it added:

"In our case there was no need for indemnity. There was no potential liability of the State against which the State might properly contract. The State is not liable for the torts of its agents or employees and to construe the contract here as reflecting an intention to provide for indemnity against a non-existent liability would do violence to the language used and would brand it as an idle waste of words. * * *"

To the same effect is *Holland v. G. D. Phillips,* 94 Ga App 361, 94 SE2d 503 (1956). The contract in that case required that "The contractor shall erect warning signs * * * at least 500 feet in advance of any place on the project where operations interfere with the use of the road by traffic * * *."

Plaintiff's decedent was riding in an automobile which plunged through an uncompleted bridge, unmarked as required by the contract. While the opinion confuses concepts of breach of contract and ordinary negligence, it holds that a contract to provide barricades and warnings "inures to the benefit of the public." Moreover, it was said that "Neither a county nor the State Highway Department · * * * is under a legal duty to post warning signs on the approaches to its bridges."

The following recent briefly noted cases held by decision, implication or obiter that a contract may fix the standard of care.

*McCleod v. Tri-State Milling Co.*, 71 S D 362, 24 NW2d 485 (1946). The plaintiff's young son was drowned in a canal operated by the defendant which ran through the town of Rapid City. The canal was excavated by a predecessor in interest of the defendant pursuant to a Rapid City ordinance which permitted the work but required that it be "boxed in a good workmanlike and thorough manner" and that the company be "responsible for damages occasioned or caused by said ditch or canal." The ordinance also required that the company keep certain streets crossing the canal in good repair. The decision said:

> "The ordinance, however, established a standard of care to be used by the milling company in return for the privilege of using the streets and alleys and its validity is not questioned. If the company has assumed a possibly higher degree of care for the protection of persons and property than that existing under the common law, we see no reason why it should not be held to such standard of care."

A judgment for the plaintiff was, however, reversed on other grounds. The court treated the ordinance

almost as a contract which, in its nature, it was. There is no reason to think that a true contract would have made a difference in the result.

*Havens v. Strayer*, 326 Pa 563, 193 A 13 (1937). The defendant had a public contract to build a new bridge which provided that two way traffic should be maintained at all times over the old bridge and that necessary barricades, warning signs, lights and watchmen should be furnished at the direction of the state engineer. The bridge started to collapse. The engineer suggested that a flagman be posted at each end to prevent more than one car passing over at a time. This suggestion was adopted but the bridge gave way and plaintiff's decedent was killed. A judgment for the plaintiff was affirmed. The court's basic reasoning was that it was negligence not to close the bridge. But it went on to say in support of its conclusion:

> "The reference to barricades is a recognition of the fact that under certain circumstances the defendant might be required in the interest of the public safety to 'barricade' the bridge."

*American Employers' Ins. Co. of Boston, Mass. v. Brandt Masonry Corporation*, 252 App Div 506, 299 NYS 984 (1937), involved a private rather than a public contract, the terms of which required:

> "During the progress of the work, the contractor must place and maintain proper and sufficient guards around hoists, fences, etc., for the prevention of accidents * * *."

A violation of this contract provision would also be a violation of section 241 (5) of the New York labor law (which weakens the case as authority). A laborer on the project met his death because appropriate guards were not in place and suit was brought by an insurer

as subrogee of the building owner against the contractor for the claim it had to pay. The court said:

"There is no reason to hold that the defendant is not liable for the consequences of this breach of contract to the same extent that it would be liable for the violation of any other of its provisions."

*Gulf Oil Corporation v. The Baltimore*, 47 F Supp 770 (DCEDNY 1942). The dredge Baltimore and another were under contract with the state of New York to deepen a part of the state barge canal. A rock was left in the channel and a Gulf tanker was damaged in consequence. The contract between the state and the Baltimore required that "the barge canal will be open to navigation during the progress of the work" and that the dredge "was to be subject to the provisions of section 182 of the canal law * * * which made it unlawful to obstruct the navigation of the canal; and that respondent should be responsible for all damages, of whatsoever nature, resulting from the work, from any cause whatsoever * * *." The court said:

"While, of course, the burden of proof rests upon the libellant to make out a case, that, it has done, by showing the contractual relations of the respondent with the State of New York."

A decree was entered for the libellant.

In *Lowery v. Kansas City*, 337 Mo 47, 85 SW2d 104 (1935), the city of Kansas City had turned a bridge over to the state and had agreed in turn to maintain lighting on it. Plaintiff was injured when his automobile rammed into a girder as a result of inadequate lighting. In holding that the plaintiff had no cause of action against the city, the court nevertheless said by way of dictum:

"When a contractor takes possession of a por-

tion of a public street for the purpose of repairing it, even though he has the right to exclude the public from that portion, his contract, to maintain certain barriers and lights and other warning devices, is an obligation which is intended to create a duty to every individual member of the public who uses the streets, and he is liable in tort for a breach of that duty."

The following cases hold that general provisions in a public contract requiring the contractor to assume responsibility for personal and property damage done during the course of the work give a right of action to members of the public directly against the contractor: *Baker v. S. A. Healy Co.,* 302 Ill App 634, 24 NE2d 228 (1939); *La Mourea v. Rhude,* 209 Minn 53, 295 NW 304 (1940); *Coley v. Cohen,* 289 NY 365, 45 NE2d 913 (1942); *Trumpbour v. Arthur A. Johnson Corporation,* 250 App Div 856, 294 NYS 575 (1937); *Wolcott v. Johnson, Drake & Piper, Inc.,* 100 NYS2d 990 (Sup, 1950); *Anderson v. Rexroad,* 180 Kan 505, 306 P2d 137 (1957).

Cases holding that public contracts are admissible in actions for damages by members of the public, decided prior to 1930, are collected in an annotation, 69 ALR 522, at page 525.

Oregon cases.

The problem is one of novel impression in Oregon. The cases cited by the appellant in support of the contract do not sustain her position. In *Wolsiffer v. Bechill,* 76 Or 516, 146 P 513 (1915), the defendant Bechill Brothers had entered into a contract with the city of Portland for the grading of a street. A city ordinance permitted the improvement in question. The contract under which the work was done provided that none of the work should be sublet without written consent and that such consent should not release the

contractor from any obligation to the city or to persons employed by the subcontractor. This agreement to assume full responsibility was required by the ordinance. Bechill Brothers violated the contract by employing O'Donnell as a subcontractor without consent. An employee of O'Donnell suffered injury. In making its defense Bechill Brothers pleaded that O'Donnell was an independent contractor and hence that Bechill was not responsible for O'Donnell's servants. The argument was rejected (although a verdict for the employee was reversed on another ground). The court said, in part:

> "By stipulating as they did under the ordinance mentioned, Bechill Bros. in a sense assumed a statutory obligation, the benefit of which inures to any person coming within its terms. They agreed that the contractor should not be released from any responsibility either to the city or to the persons employed by any subcontractor. Under these circumstances, they could not evade their statutory duty by subletting the work to O'Donnell * * * In short, the dealing with O'Donnell by Bechill Bros. was in derogation of a duty imposed upon them by the very ordinance and the contract under which they were operating and cannot affect their obligation to the plaintiff. In principle it comes within the doctrine of Ackles v. Pacific Bridge Co., 66 Or. 110, (133 Pac. 781), where Mr. Chief Justice McBride said:
>
> "'Where a statute or city ordinance requires certain precautions to be taken for the safety of the public in the manner of doing the work, the contractor cannot shift his liability for failure to take these precautions by employing a subcontractor. * * *'"

From the language quoted it is obvious that the court regarded the ordinance as controlling, and that the contract was simply proof that the contractor

was aware of the liability it assumed. Moreover, it seems certain that a purpose of this ordinance was to give a right of action against the contractor to any employee of a subcontractor. One can not, therefore, plausibly argue that the ordinance created merely an indemnity provision running only to the city and that the court was making a new departure in construing it to give a right of action to a third party.

Another case cited by appellant, *Chadwick v. Oregon-Washington R. & Navigation Co.,* 74 Or 19, 144 P 1165 (1914), is even less conclusive. Chadwick was an engineer in the service of the defendant railroad company and claimed injury from the negligence of another engineer. This court used the safety regulations of the railroad company as a standard of care. It said:

> "It is requisite that the defendant should make suitable rules for the movement of its rolling stock. This obligation is due, not only to its employes, but also to the general public who patronize it in its capacity as a common carrier. Reasonable regulations thus devised become the standard by which care or negligence is determined."

This case is not relevant to the disposition of ours, not only because no contract was involved, but because railroads operate what is in effect an independent system of highways for which company regulations perform the same function that the motor vehicle code performs for public roads. In the absence of intramural regulations recognized by law, the operation of railroads and other businesses would be seriously hampered.

Conclusion as to admissibility of public contracts in general.

■ In spite of the lack of local precedent we think that a construction contract which requires the use

of warning signals is, by the weight of reason and authority, admissible in evidence against the contractor. We prefer not to ground our decision on a ruling that we have here a third party beneficiary contract and that the standard of care imposed by the contract supersedes that required by the common law. This is an action for damages arising out of negligence, and the contractor's duty even in the face of such a contract as this remains a duty to use reasonable care. But reasonableness depends on the circumstances, and here the contract was a circumstance. It is evidence of what the contractor conceived the measure of his duty to be. Of course, the fact that one sets for himself exacting standards of conduct higher than the law requires will not in the ordinary case expose him to the danger of liability at the suit of one injured by non-observance of those exacting standards. But set in the context of this litigation, simply as a matter of common sense it is not unfair to let the jury consider the contract. Candor compels an admission that we do not know whether this contract was intended to give the public a right to sue the contractor. But if the parties did not actively think about it, the whole tenor of the agreement nevertheless lies in that direction. The provision for warning signals and signs is somewhat more than a mere indemnity clause. (We assume that the state can contract to indemnify itself against a non-existent liability, since it is possible that between the signing of the contract and completion of the work the legislature will waive sovereign immunity, and overlook to make exemption for contracts already let.) The provision was put into the contract with the safety of the motoring public foremost in mind. It does not substantially increase the legally imposed duty of the contractor to give notice of traps and obstructions. The purpose of the pro-

vision appears to have been to emphasize the measures of safety which the contractor was expected to observe while engaged in the work. It put the standard of care into bas-relief. It was adequate warning that some liability would attach somewhere for non-observance. The contractor undertook the work knowing what was expected of him, and it is fair to let the contract enter into the jury's consideration of what was reasonable under the circumstances.

Tort damages where contract is involved in suit.

■■ This is an action for damages arising from tortious conduct. *Harper v. Interstate Brewery Co.,* 168 Or. 26, 120 P2d 757 (1942) holds that one may not ordinarily sue in tort for breach of a contract unless breach of the contract also violates an independent legal duty. But we have recognized also that there may be a recovery of damages in tort for the breach of a third party beneficiary contract, where tortious damage to the beneficiary is the natural and foreseeable result of the breach. *McLeod v. Pacific States Tel. & Tel. Co.,* 52 Or 22, 94 P 568, 95 P 1009 (1908). Assuming for the sake of argument that we have here a third party beneficiary contract for the benefit of travelers on the highway, we see no reason why an action in tort should not succeed where the contract itself sets up a tort measure of damages upon adequate consideration. And if, as we hold, that contract does not establish the right to recover but comes in merely as evidence of what is reasonable care, no problem arises.

Application of contract in suit not a jury question: conclusion.

■ But this does not complete the inquiry for we still have to determine whether the danger complained of in this suit—dump trucks turning into the quarry

road—was of a category for which the contract demanded warning signals "to insure the safety of the public." If it was not, the contract is irrelevant and no error was committed in striking it. If it was, then the contract should have been admitted as evidence on the question of reasonable care. And it is on this point that we think the appellant's argument lacks merit. It is for the court and not for the jury, in the first instance, to construe the contract and to determine what classes of obstructions fall within the contemplation of the warning provision. We are led to the conclusion that the contract did not contemplate warning signs at access roads.

In the absence of contract, warning signs or flagmen would clearly not be required by law at the entrance to this quarry road. The road apparently was frequently traveled by large dump trucks with beds six to eight feet wide. If we concede arguendo that this kind of vehicle is a source of danger to passenger vehicles it is nevertheless true that the law draws no distinction between a truck and any other vehicle and its owner is not charged with liability for accidents so long as the rules of the road are observed. Since this is the case we think that a clearer expression of intent than is to be found in the disputed contract provision is required to charge the contractors with the duty of placing signs where trucks have a right to operate without them.

The whole flavor of the warning signal clause is directed not at the kind of danger here in question but at physical obstructions in the roadbed attendant upon the work of construction—as pitholes, torn up stretches of road way, piles of materials and the like. Note the use of the words "barricades, fences, signs or other adequate protection" and "danger lights, signals and flagmen." We think that those terms clearly

contemplate this kind of obstruction and that the more general terms are to be read as ejusdem generis. Possibly road grading machines, earth movers, steam rollers and other unwieldy equipment never intended for use in traffic would fall within the contemplation of the contract as requiring flagmen or signals, but we do not feel justified in going beyond this to say that the clause also applies to vehicles of a class commonly found on the highways.

Our view is strengthened by the fact that in every case where it has been held proper to introduce a contract calling for warning lights and signs there was some likelihood that a duty to use due care independent of the contract had also been violated. But here there was no independent duty. The situation is much like that presented in *C. C. Moore Const. Co. v. Hayes,* 119 F2d 742 (CA5th Miss, 1941). The defendant company had entered a contract with the state of Mississippi to build ten miles of road way. One end of this highway connected with a city street at an angle of 120 degrees. The contract called for the defendant to "provide, erect, and maintain all necessary barricades, sufficient red lights, approved danger signals and signs, provide a sufficient number of watchmen, and take all necessary precautions for the Work and Safety of the Public." At the request of the state this road was opened to the public when substantially completed. There were no warning lights or signals at the angle where the roads joined and the plaintiff ran his automobile off the road at this point at night. A judgment for the plaintiff was reversed. The court, in ruling that there was no question for the jury, said:

"Hayes and his companions had a right to be on the road, and the contractor was under a duty to warn the public of any defects or dangers in

and along the roadway. The record shows, however, that there were no defects in and along the new section of the highway; that it was straight and level; and that on the night of the accident it was in perfect condition. * * *

* * *

"* * * The curve where the highway entered Hawkins Avenue did not constitute a pitfall or deathtrap for motorists. The curve was not in itself dangerous and could be and was safely negotiated by drivers of other automobiles traveling along the road that very night. * * *"

*McClendon v. T. L. James & Company*, 231 F2d 802 (CA5th La, 1956), also supports the position we take. The contractor defendant had entered an agreement with the state of Louisiana to repair a stretch of road. There was a pothole in the road six miles away from the actual situs of the repair work but within the limits of the repair project. The contract called for lights, flagmen and warning signs. None were placed at this spot and plaintiff claimed that a fatal accident occurred as a result. It was held that one not in privity to the contract could not plead it. But the court went on to discuss plaintiff's contention that the contract terms created a "standard of care." Plaintiff had argued that the jury could have construed the contract to mean that lights must be furnished at the natural defect in the road. This contention was rejected. The court said:

"But the contract, in writing, with no factual controversy for jury deliberation, was for the court to construe * * * In that search the anxiety of the court, from reading it as a whole and considering the inherent reasonableness or unreasonableness of possible alternatives, is to determine the intention of the parties to the contract."

It held that the contractor was under no duty to install lights or other warning devices.

The plaintiff's first assignment of error is without merit and must be dismissed.

The second assignment of error is expressed by the appellant (plaintiff) in this way:

"The court erred in denying plaintiff's motion to withdraw from the jury's consideration the affirmative defense contained (see Ab 7) in the Amended Answer of Warren Northwest, Inc."

The pleading just mentioned charged that:

"* * * prior to the accident, the plaintiff and her husband consumed alcoholic beverages and any injuries or damages suffered by plaintiff in the accident referred to in her third amended complaint were proximately caused and contributed to her by her own carelessness, recklessness and negligence in participating in a ride in which she and the driver of the vehicle involved consumed alcoholic beverages and in riding in a vehicle being operated by a driver who was under the influence of intoxicating beverages which she well knew and in failing to remonstrate * * *."

The motion to withdraw that defense was made after defendant Warren Northwest, Inc., had rested. When plaintiff's counsel made the motion he expressed its basis in these words: "There is no evidence to sustain it." (that is, the defense)

Preceding paragraphs take note of the evidence which governs this assignment of error. It indicates that although one of the bottles of whiskey was three-quarters full when Mr. Larson placed it in his car a few hours before the accident it was less than half full after the accident. The record offers no explanation of that fact. The plaintiff contends that Lake's testimony to the effect that he saw Larson, immediately after the accident, remove two bottles of liquor from his car and place them behind a log near the road was

inadmissible. As a basis for that contention he calls attention to the fact that the plaintiff was unconscious at that time and, therefore, could not have directed her husband in his purported act of removing the bottles nor have known about it. We do not believe that testimony showing the purported liquor handling was dependent upon the plaintiff's knowledge of it.

■ It is our belief that the record contains sufficient evidence to have rendered the issues as to the Larsons' drinking and the alleged duty of the plaintiff to have protested as to the manner in which the car was being operated jury questions.

■ The third assignment of error is based upon a ruling of the trial judge which permitted Lake to answer that immediately after the accident he saw Larson remove from Larson's car two bottles of liquor and place them behind a near-by log. The plaintiff objected to the question which produced that answer upon the ground that she was unconscious at that time and that "whatever the driver did is not binding upon the plaintiff." In disposing of the second assignment of error we considered a similar contention which the plaintiff presented as a part of that claim of error. We do not believe that the court erred when it permitted Lake to give the answer which he made. The answer indicated that the Larson car carried two bottles of liquor and that one of them contained substantially less liquor than the amount which Larson said was in it when he placed it in the car at the beginning of the journey. We believe that that evidence was material to the defendant's contention that the Larsons had partaken of liquor and that Mr. Larson was intoxicated.

The fourth assignment of error charges:

"The court erred in failing to withdraw from the jury's consideration subparagraph (c) of the

affirmative answers of Heintz & Ryan and of Phillips, which charged failure on Ray Larson's part to keep a lookout."

■ Every motorist must be alert and watchful so that he will apprise himself of all travelers and all things, the presence of which upon the road might be a matter to which he should give attention. The truck was ahead of the Larsons. It was above average in size. There was nothing upon the road between the truck and the Larson car. The road was straight and level. If Phillips' testimony which is set forth in a preceding paragraph reflects the truth, he gave an arm signal proclaiming his intention to turn to the left and kept his arm protruding to the left until his truck was well over the left side of the pavement. Phillips' testimony, if true, also shows that the truck ran for 60 or 70 feet to the left of the center of the road as it approached the quarry road. It seems clear that Phillips' testimony demanded that the issue as to whether Larson maintained an adequate lookout was for the jury. We find no merit in the fourth assignment of error.

The fifth assignment of error reads:

"The court erred in failing to withdraw from the jury's consideration subparagraph (d) of the affirmative answers of Heintz & Ryan and of Phillips which charged failure by Ray Larson to sound a horn before passing."

In support of that claim of error the plaintiff's brief argues:

"Testimony that a witness did not hear a signal was not sufficient to raise an issue for the jury as against positive testimony that it was sounded, where it was not shown that such witness was listening."

■ The testimony given by Phillips could warrant a finding by the jury that he was alert and was paying

attention to the operation of his truck as he approached the quarry road and prepared to turn into it. He testified that he did not hear the Larson car sound its horn before it undertook to pass his truck.

Mrs. Mary Brown, who, as we have said, was seated beside the plaintiff in the front seat, gave this testimony as a witness for the plaintiff:

"Q * * * you didn't hear any horn from Mr. Larson's car, either, did you?
"A No, sir; I don't remember hearing it."

Wigmore on Evidence, 3rd edition, § 664, referring to negative testimony states:

"Yet there is no inherent weakness in this kind of knowledge. It rests on the same data of the senses. It may even sometimes be stronger than affirmative impressions. The only requirement is that the witness should have been so situated that *in the ordinary course of events he would have heard* or seen the fact had it occurred. This sort of testimony is constantly received,—particularly in proof of the failure to give railroad signals, the loss of a chattel, the absence of a witness, the non-existence of a fictitious person, the non-payment of money, and other negative facts:"

In *Layne v. Portland Traction Co.,* 212 Or 658, 319 P2d 884, 321 P2d 312, both parties depended in part upon negative testimony and neither questioned the persuasiveness of that type of proof.

*Lovett v. Gill,* 142 Or 534, 20 P2d 1070, held that if a witness was in a position where he could observe, if he made use of his faculties, his testimony that the purported event did not take place, although negative in form, is in reality of a positive character. The following is taken from *Fish v. Southern Pacific Co.,* 173 Or 294, 143 P2d 917, 145 P2d 991:

"The evidence of the appellant's engineer and of the fireman was positive, to the effect that the

bell was rung, while the evidence of plaintiff and his supporting witness was negative, to the effect that they heard no bell. Appellant contends that the positive evidence must prevail, under the rule that, other things being equal, positive evidence is stronger than negative. Under the circumstances, however, we must consider the evidence of the plaintiff, at least, although couched in negative form, as being affirmative in fact. His attention was centered upon listening for the very thing which he testified that he did not hear. * * *"

Moreover, witnesses are not subject to the law of fungibles. Juries properly distinguish between them. A witness who gives positive testimony may be rejected by the jury as an unreliable source of the facts and one who gives negative testimony may be viewed with favor. This assignment of error lacks merit.

██ We will consider the sixth and seventh assignments of error together. The sixth challenges an instruction which told the jury:

"If you find from a preponderance of the evidence that the plaintiff knew, or by the exercise of reasonable care and prudence should have known, that the driver of the automobile in which she was riding was negligent as charged in the answers of defendants and that the same contributed as a proximate cause to the accident in question, but, nevertheless, with knowledge of this fact and without protest or remonstrance the plaintiff rode in said automobile and acquiesced in the negligence of the driver, if any, and thereby was injured, then and in that event the plaintiff was guilty of contributory negligence."

The seventh assignment of error charges that the trial judge erred in instructing the jury as follows:

"I instruct you that if you shall find from a preponderance of the evidence that the driver of the automobile in which plaintiff was riding was,

by reason of the use of intoxicating liquor, mentally or physically unable to properly and safely operate said automobile, and that such inability to properly and safely operate said automobile was the proximate cause of the accident, and if you further find that the plaintiff knew of the physical and mental condition of the driver of the automobile aforesaid or by the exercise of reasonable care and caution should have known of the physical and mental condition of the driver of the automobile as aforesaid, and did thereafter continue to ride in said automobile without protest or remonstrance, then I instruct you that plaintiff was guilty of contributory negligence."

Both instructions are challenged on the ground that they were unwarranted by the evidence. We have read the transcript of evidence with care and believe that the trial judge was warranted in giving to the jury both instructions. Larson's act in making the purported concealment of the bottles could have warranted an inference by the jury that he had partaken of their contents and wished to conceal that fact.

The sixth and seventh assignments of error lack merit.

We come now to the last, that is, the eighth, assignment of error; it reads:

"The court erred in refusing to award plaintiff a new trial."

The only part of the motion for a new trial and the supplemental motion which has been presented upon appeal submit as their bases the following:

"1. Misconduct of a material witness whereby plaintiff was prejudiced, in that the witness Roy Lake falsely testified he was near the scene of the accident at the time it occurred, and falsely testified that shortly before the accident the witness was driving at 70 miles per hour and was overtaken

and passed by the car in which plaintiff rode, which was proceeding at a speed estimated by the witness Lake to be between 80 and 85 miles per hour.

"2. Newly discovered evidence, material for plaintiff, which she could not with reasonable diligence have discovered and produced at trial, which evidence consists of the repudiation by the witness Roy Lake of the testimony he gave against plaintiff at trial."

The third paragraph of the motion is similar to the second, but submits "accident or surprise" as the reason why "plaintiff could not have known" that Lake would testify falsely.

The motion was accompanied by an affidavit of Lake in which, after referring to the testimony which he gave during the trial, he declared:

"My testimony on that occasion was not correct in that I was not passed by the Larson car before the accident and as near as I remember, I was at Crescent, Ore. when the accident happened & was advised to go to the scene. When I went to the scene Marvin Smith was with me and to my recollection no one passed us. When we arrived at the scene there were a number of other people there. I don't know why I gave the testimony I did but it was not correct as I did not see the Larson car before the accident."

It will be noticed that Lake retracted the parts of his testimony wherein he had stated that the Larson car, while traveling 80 to 85 miles per hour, passed him, and that he was the first person who came to the scene of the disaster, but that he left unmentioned his other testimony which disclosed that Larson removed two bottles of liquor from the Larson car and placed them behind a nearby log. Crescent, the place which is mentioned in Lake's affidavit, is about

five miles from the scene of the accident. The plaintiff makes no claim that any of the defendants were responsible for the character of the testimony which Lake gave at the trial or had induced him to depart from the truth. The defendants do not concede that Lake's affidavit states the truth and that he gave false testimony at the trial. They argue that the erratic course which the Larson car took for 164 feet after the impact and before it came to rest demonstrates that it must have been traveling at a high rate of speed when it undertook to pass the truck. They, therefore, contend that the record contains reliable evidence showing that the Larson car, at the crucial moment, was proceeding at an unreasonable rate of speed.

In a memorandum opinion which denied the motion for a new trial the circuit court judge declared:

"* * * A review of the testimony of the witness Phillips concerning the accident and that of Sergeant Holley concerning the physical effects he observed upon his investigation, indicates that even without the testimony of the witness Lake the jury could have reached the same conclusion it did relative to the manner in which the Larson car was being operated."

Lake's affidavit was supported by an affidavit of a person who swore that he was with him on the afternoon of the accident. The record contains an affidavit of another employee of the Oregon State Highway Commission to the effect that he did not see Lake at the scene of the accident until some minutes after it had happened. One of plaintiff's counsel signed an affidavit in which he stated that while he was investigating the facts he spoke to Lake's superior and was told by him that Lake knew nothing about the accident. In this affidavit counsel for the plain-

tiff also stated that he attempted to interview Lake but failed in his attempt because Lake at that time was out of town. Finally, the affidavit indicates that plaintiff's counsel was informed by several people that Lake was unreliable. The statement which attributed unreliability to Lake was, of course, hearsay. No reason was given for not securing affidavits from the persons who deemed him unreliable. None of the affidavits which came from persons who knew Lake described him as unreliable.

In surveying the situation presented by the motion for a new trial we must take into account, according to our belief, that Lake did not come before the jury as a witness whose testimony was unchallenged. It will be recalled that Mr. and Mrs. Lewis Lynn swore that they were the first motorists who came upon the scene of the accident. Accordingly, when Lake later testified that he was the first to arrive, his testimony was in direct conflict with the Lynns' testimony. Further, Sergeant Holley of the Oregon State Police swore that he asked all who were at the scene of the accident, including Lake, whether any of them had seen the accident occur and that all of them, including Lake, replied in the negative. Sergeant Holley's report of the accident mentioned Lake. James V. Riley, an insurance investigator, through an affidavit, swore than in investigating the accident he spoke to Lake's superiors and that one of them, Fossen, stated:

"* * * Roy E. Lake, who was an inspector for the Oregon State Highway Commission and who was, at the time of my interview with Mr. Fossen, stationed at the Maintenance Department for Oregon State Highway Commission at Rufus, Oregon, was an early arrival at the scene of the accident; that Mr. Fossen located a diary kept by

said Roy E. Lake, which diary contained an entry covering the accident; that this diary recited the names of the parties involved and contained certain measurements, and further recited that the Larson car had one full bottle of liquor and one-half bottle of liquor in it.

"That at about the time I talked to Mr. Fossen, I also examined the accident report of Oregon State Police Officer Fay Holley, which recited these same measurements as those set forth in Roy E. Lake's diary, and also recited the presence of alcoholic beverages at the scene of the accident; that the Police Officer's report also recited that all the measurements were made by Officer Holley and Roy E. Lake.

"That thereafter, on or about October 27, 1954, I went to Rufus, Oregon, to see Mr. Roy E. Lake, principally for the purpose of determining on what physical facts of the accident and the scene he had information; that immediately upon contacting Mr. Lake at his home at Rufus, Oregon, I advised him that I was investigating this accident for Warren Northwest, Inc. and that we had got a late start and my investigation was quite delayed; that Mr. Lake thereupon told me what he knew about the accident, the physical facts thereof, and the physical facts at the scene of the accident, and gave me a written statement covering these facts; that I wrote this written statement just as Mr. Lake gave me the information and exhibited the statement to Mr. Lake page by page as I wrote it; that Mr. Lake read each page as I showed it to him and in each case approved the contents thereof and at the bottom of each page so written by me and read by him, Mr. Lake appended his signature, together with the following words: 'I have read this page.' * * *"

The statement by Lake, described in the language just quoted, is attached to Riley's affidavit. It gave an account of the events which immediately preceded the accident and of Larson's handling of the two bottles

of liquor, in substantially the same way as Lake narrated them from the witness stand.

The fact that Lake spoke freely to Riley and gave him the detailed statement from which we quoted serves to warrant an inference that he was available to any of the parties and willing to speak to them.

ORS 17.610, which lists the grounds on which a new trial may be granted on the motion of the party aggrieved, includes these: "Misconduct of the jury or prevailing party"; "Accident or surprise which ordinary prudence could not have guarded against"; and "Newly discovered evidence, material for the party making the application, which he could not with reasonable diligence have discovered and produced at the trial." ORS 17.630 governs new trials on the court's own motion; it does not specify the grounds for such action. The motion for new trial by the plaintiff, based on the purported perjury, specified three grounds: first, misconduct of a material witness; second, newly discovered evidence and third, accident or surprise.

The trial court, in denying the motion for a new trial, gave as the basis for the ruling several reasons. The first was that misconduct of a witness was not a statutory ground for a new trial, although misconduct of a juror or of a prevailing party could have that effect. Apparently with that circumstance in mind the plaintiff argues that a court has inherent power to grant a new trial, aside from statute. Her counsel cites *Shain v. Meier & Frank Co.,* 140 Or 518, 13 P2d 360 (1932), and *Pullen v. Eugene,* 77 Or 320, 146 P 822, 147 P 768, 147 P 1191, 151 P 737 (1915). In both of those cases, the issue was whether the trial judge was correct in granting a new trial, not whether he was right in denying one. She has also cited *State*

*ex rel Ricco v. Biggs,* 198 Or 413, 255 P2d 1055, which holds that when the trial court has jurisdiction to hear an issue it must decide on the merits. Since (1) the trial judge did not see fit to exercise his powers outside the statute (cf. *DeVall v. DeVall,* 60 Or 493, 118 P 843, 120 P 13), (2) the plaintiff has cited no case holding that perjury is misconduct of a witness that entitles a party to a new trial, and (3) the motion was considered by the trial judge on the merits under what we consider the proper statutory ground, i.e., newly discovered evidence, we can not say that he should have granted a new trial on this ground.

The second ground given by the trial judge was based on the premise that this was a case of purportedly newly discovered evidence. That was, in our belief, the proper interpretation of the situation. The trial judge first stated that a new trial must be denied for "mere perjury." He then added that he could not conclude that a different result would have obtained if the testimony of Lake were excluded. The plaintiff urges that under *Watrous v. Salem Brewery Association,* 151 Or 294, 49 P2d 375 (1935), perjury is a ground for a new trial. It is true that that case so held, but the party accused of perjury was not a witness, but the plaintiff himself. We do not think that the statement of the trial judge that this was "mere" perjury meant "friendly" perjury, as the plaintiff argues, but that it means perjury by a witness who is not a party and which is not further corrupted by influence from the beneficiary of the perjury. *Wallace v. Portland Ry., L. & P. Co.,* 88 Or 219, 159 P 974, 170 P 283 (1918), so held. After noting that the issue was presented to the discretion of the trial court and will not be reviewed without a showing of plain abuse, the court went on to say:

"* * * That perjury of a witness is not

ground for setting aside a judgment on appeal or otherwise is held in Friese v. Hummel, 26 Or. 145, (37 Pac. 458, 46 Am. St. Rep. 610); State v. Gardner, 33 Or. 149, 152, (54 Pac. 809); Orr v. Orr, 75 Or. 137, (144 Pac. 753, 146 Pac. 964). * * * The very presence of an issue of fact is notice to both parties that witnesses will probably contradict each other and that the party holding the affirmative must establish it by a preponderance of the testimony. Thus they are forewarned of possible perjury and cannot claim that they have been surprised in the sense contemplated by the statute."

See also, *State v. Goodloe,* 144 Or 193, 24 P2d 28.

■ In addition to these cases holding that perjury is not a ground for a new trial, it is the rule in this state that equity will not set aside a judgment for intrinsic perjury, *Windsor v. Holloway,* 84 Or 303, 164 P 1177 (1917); *Dixon v. Simpson,* 130 Or 211, 279 P 939 (1929); but may where the perjury is extrinsic and prevents the party from getting all the facts, *Oregon-Washington R. & Nav. Co. v. Reid,* 155 Or 602, 65 P2d 664 (1937). As noted in Freeman on Judgments (5th ed., 1925) § 235, the "almost universally accepted view" is that relief will be denied for "mere perjury," citing the Wallace case, supra, and there is no reason not to apply the same rules at law and in equity.

The Watrous case, supra, turned to the case of *State v. Hill,* 39 Or 90, 65 P 518 (1901), which enumerates the requirements which newly discovered evidence must meet before it will suffice as grounds for a new trial, and found that the evidence of perjury met all of the requirements. We take the following from the Hill case, which has been cited or quoted from with approval in the cases of *State v. Edison,* 191 Or 588, 232 P2d 73 (1951); *Stern v. Volz,* 52 Or 597, 98 P 148 (1908); *Seaton v. Security Savings &*

*Trust Co.,* 131 Or 261, 282 P 556 (1929); and *Goldfoot v. Lofgren,* 135 Or 533, 296 P 843 (1931). See also *State v. Davis,* 192 Or 575, 235 P2d 761 (1951) which follows the Edison case, supra.

"* * * A verdict may be set aside and a new trial granted, on the motion of the party aggrieved, on the ground of newly-discovered evidence material to the party making the application, and which could not with reasonable diligence have been discovered and produced at the trials * * *. Newly-discovered evidence which will justify a court in setting aside a verdict and granting a new trial must fulfill the following requirements: '(1) It must be such as will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it must be such as could not have been discovered before the trial by the exercise of due diligence; (4) it must be material to the issue; (5) it must not be merely cumulative to the former evidence; (6) it must not be merely impeaching or contradicting the former evidence': 14 Ency. Pl. & Pr. 791; *Berry v. State,* 10 Ga. 511.

* * *

"* * * While the rule is well settled in this state that the action of the trial court on a motion for a new trial on account of any matter within the knowledge of a party prior to the submission of the cause to the jury is not reviewable on appeal, and therefore cannot be assigned as error [citing cases], yet when anything occurs after the cause has been submitted which tends to subvert justice, or shows that a fair trial has not been had, and which by the exercise of reasonable diligence on the part of the defeated party could not have been ascertained or prevented, his affidavit and motion for a new trial, predicated upon such matters, presents a question which the court should weigh and decide with care, and whenever its judgment thereon is manifestly wrong it will be reviewed on appeal * * *."

■ As early as the case of *Territory of Oregon v. Latshaw*, 1 Or 146 (1855), it was held that evidence to impeach or discredit a witness went to a collateral issue and would not be grounds for a new trial. As recently as the case of *Newbern v. Exley Produce Express*, 208 Or 622, 303 P2d 231 (1956), where the issue was the actions of a truck just prior to the time the car in which plaintiff was riding hit it, and the plaintiff wished to introduce statements by the truck driver which differed from his testimony, the court stated that it is well established that applications for a new trial upon the ground of newly discovered evidence are not favored but are viewed with distrust and suspicion. The decision pointed out that motions for new trials are granted cautiously because of the possible injustice of allowing the loser to employ as the basis of his motion evidence which his motion describes as newly discovered but which represents nothing other than his failure to have investigated his case thoroughly before trial. Further, the decision took note of the fact that motions for a new trial are subject to the discretion of the trial judge, especially where predicated upon a claim of newly discovered evidence. The decision quoted the following from 39 Am Jur 164, New Trial, § 157, as follows:

"Power to grant an application for a new trial on the ground of newly discovered evidence is vested in the trial judge to the extent that his ruling thereon may not be made ground for reversal on appeal unless the appellant can establish an abuse of judicial discretion. It is said that the ordering of a new trial rests 'largely' within the discretion of the court. * * * Where the right to a new trial on the ground of newly discovered evidence is statutory, the discretion of the trial court in refusing to grant the application will not be interfered with on appeal, so it is said, unless a 'reasonably clear' case of abuse of discretion is presented."

█ The Washington Supreme Court has made a cogent observation on the discretion of the trial judge in a case involving the recantation of an important witness in *State v. Wynn,* 178 Wash 287, 34 P2d 900 (1934). It stated:

"* * * Recantation by an important witness of his or her testimony at the trial does not necessarily, or as a matter of law, entitle the defendant to a new trial. The determination of such matters rests in the sound discretion of the trial court and its action will not be set aside except for clear and manifest abuse. The trial judge is in a peculiarly advantageous position, under the prevailing circumstances, to pass upon the showing made for a new trial. He has the benefit of observing the witnesses at the time of the trial, is able to appraise the variable weight to be given to their subsequent affidavits and can often discern and assay the incidents, the influences, and the motives that prompted the recantation. He is therefore, best qualified to determine what credence or consideration should be given to the retraction, and his opinion is accordingly entitled to great weight. If the rule were otherwise, the right of new trial would depend on the vagaries and vacillations of witnesses rather than upon a soundly exercised discretion of the trial court. * * *"

For cases from other jurisdictions, see the annotation in 10 ALR2d 381 (1950), "Statements of witness in civil action secured after trial, inconsistent with his testimony, as basis for new trial on ground of newly discovered evidence." The summary to that annotation notes that such applications are primarily within the discretion of the trial judge and that factors similar to those we have outlined must be met before a new trial is warranted. We take the following from the summary:

"The appellate court will uphold the ruling of the trial court granting a new trial on a discre-

tionary ground when it would have refused to disturb the decision of that court had a new trial been denied, and will sustain such order even though the trial court would have been justified in reaching a different conclusion, and although the appellate court might deem a different conclusion the better one."

Though it might be urged that the trial judge felt he had no power to grant a new trial for "mere perjury" and therefore did not exercise his discretion (See *U. S. v. Troche,* 213 F2d 401 (2nd CCA, 1954), where a similar contention was made and rejected), we cannot say he incorrectly stated the law, nor did not use his discretion in view of the fact that he also concluded that the omission of Lake's testimony would not change the result of the trial. This is, of course, the first requirement which must be met before a new trial should be granted, and we can not say that the trial judge was unwarranted in coming to that conclusion.

In addition, in deciding the third ground of the motion, surprise, the trial judge concluded that sufficient diligence was not shown to make out a statutory case of surprise. It is apparent that, in this context, the diligence of the party really goes to the ground of newly discovered evidence, not surprise. Thus, we may conclude that another ground enumerated in *State v. Hill,* supra, has not been met. Further, there is a presumption that diligence has not been met. In *Lewis v. Nichols,* 164 Or 555, 103 P2d 284 (1940), where the plaintiff wished to introduce testimony of an eyewitness to an accident, we held that motions for new trials, which are based upon claims that additional evidence has been recently discovered, are viewed with distrust. The decision took note of the close scrutiny to which claims of newly discovered evidence are sub-

jected. According to it, and other decisions of like kind, a presumption faces the moving party that he failed to exercise due diligence in preparing for trial, and, as a result, neglected to find the witness or item of evidence which his motion describes as newly discovered. The catechizing attitude with which courts entertain this type of motion for a new trial finds its real basis in common experience. First, virtually every litigant regards a law suit as highly important and, in part as a result of his desire to win, exhausts the possibility of witnesses as the day for trial approaches. Next, if new trials could be had except for the most urgent of reasons litigation would never end. In the case at bar the plaintiff's attorney was aware of the existence of Lake, but claims that some persons told him that Lake knew nothing about the accident. However, those same persons directed an investigator for the defendants to a diary kept by Lake which referred to the whiskey. While we can not know for certain that questioning Lake would have revealed his perjury, the quickness with which he recanted after the trial at least indicates that he might have changed his story at an earlier time if a representative of the plaintiff had interviewed him. *In re Estate of Stoll,* 188 Or 682, 214 P2d 345, 217 P2d 595 (1950), holds that a statement of a party that there were no other witnesses does not excuse a failure to check further when there were in fact such witnesses, as became apparent after the trial had closed. That situation coupled with the presumption against diligence, *Lewis v. Nichols,* supra, renders it impossible for us to say that the plaintiff exercised the required efforts or that the trial judge was wrong in coming to his conclusion.

Finally, while an actual recantation after the trial by a witness is not strictly impeaching testimony,

it is close to it. When added to the fact that the re-cantation is in a sense cumulative, since the very first witness for the plaintiff testified that no one else arrived at the scene of the accident for some five or ten minutes after it happened, and the jury could thereby infer that Lake was not telling the truth, there is a partial failure to meet other requirements laid down in *State v. Hill,* supra.

We reject the eighth assignment of error as lacking in merit.

Affirmed.