Argued April 4; reversed June 11, 1940

# LEWIS *v.* NICHOLS

(103 P. (2d) 284)

556

Department 2.

*William H. Morrison,* of Portland (Maguire, Shields & Morrison, of Portland, Carson & Carson, of Salem, and Donald K. Grant, of Portland, on the brief), for appellant.

*Mark V. Weatherford,* of Albany (Weatherford & Thompson and Marks & McMahan, all of Albany, on the brief), for respondent.

ROSSMAN, J. This is an appeal by the defendant from an order of the circuit court which set aside a judgment in favor of the defendant, based upon a jury's verdict, and ordered a new trial. The order was entered upon the plaintiff's motion. The basis for this action is the complaint's averment that July 23, 1937, the defendant negligently drove his automobile south on Liberty street in the city of Salem and while so doing ran it into the plaintiff, who at that time, so the complaint avers, was walking in the south pedestrian lane at the intersection of Liberty and Chemeketa streets. Liberty street lies north and south and Chemeketa street east and west. The complaint avers that the defendant was negligent in the following particulars: (a) failed to yield the right of way to the plaintiff; (b) failed to maintain a lookout for pedestrians; (c) failed to have control over his automobile; and (d) drove his automobile at a negligent rate of speed. The answer denies those averments.

The order which set aside the judgment and ordered the new trial states: "The plaintiff be and hereby is granted a new trial herein, all solely on the ground of newly discovered evidence."

The motion for a new trial was accompanied by the affidavits of the plaintiff and of one W. H. Mills. The latter, so the plaintiff's affidavit states, was the newly discovered witness. Before giving a review of those affidavits, we shall take note of the evidence received during the trial. We shall first review that presented by the plaintiff.

The plaintiff swore that July 23, 1937, at about 4 o'clock in the afternoon, he parked his automobile on the north side of Chemeketa street, a short distance west of Liberty street which between curbstones is 60 feet wide. Some minutes later he walked east on Chemeketa street to the intersection, then crossed Chemeketa street to the southwest corner of the intersection. Next, he walked east in the south pedestrian lane until he had reach the southeast corner of the intersection. He claimed that he was looking for an employee of his named Karl Menger. He swore that when he reached the southeast corner he turned around and observed that Menger was on the southwest corner which he (plaintiff) had left only a moment previously. Having located Menger, he claimed that he started to retrace his course, but was struck by the defendant's car before he had reached the yellow line which marked the center of Liberty street. He did not see the car before he was hit. He was positive that as he walked west he was in the pedestrian lane. Earl Bice testified that upon the aforementioned occasion he was going west on Chemeketa street and observed the plaintiff on the southeast corner of the intersection. He did not see the accident and gave no other testimony material to any issue with which we are concerned. Atlee Wintersteen, a member of the Salem police department, arrived at the scene of the accident immediately after it had happened. He swore that the plaintiff was lying 24 feet south from the south edge of the pedestrian lane and 3 feet west of the center of the pavement. Further, according to him, the left headlight of the defendant's car was broken and bent slightly backward. Wilber Straw, the proprietor of a service station at the southwest corner of the intersection, was in

his station at the time the collision occurred. He testified: "I either seen the impact or a moment after it happened." He was then asked: "Where was the pedestrian at the time you saw him?" and answered, "He was just right near the pedestrian lane and about —oh, possibly one-third of the way from the curb, maybe a little further." He was then asked whether he meant the west side of the street, and answered "Yes." He said that when the car struck the plaintiff the latter hung on the front of the car and stayed there until the car stopped. After it had stopped the car was "I would say between 20 and 30 feet" south of the pedestrian lane. Although he had not seen the defendant's car before the impact, nevertheless, he estimated its speed as "between 20 and 25." When the car had come to rest the plaintiff was lying on the pavement, according to Straw, "a little closer to the center than to the curb." When he first saw the car he thought that "possibly half the motor and about the front wheels was past the yellow line" which marked the south boundary of the pedestrian lane and the car itself was "just a little over halfway between the center of the street and the curb." E. S. Stultz, an employee of the plaintiff, had accompanied him up to the time he parked his car and remained in the car after the plaintiff left. Although Stultz was seated in a parked car which was facing westerly, he swore that he saw the plaintiff walk east to the intersection of Chemeketa and Liberty streets and cross Chemeketa to the southwest corner and then step off the curb. Further, he testified that after the plaintiff had stepped off the curb he saw him proceed eastward in the pedestrian lane "almost at the center" thereof. He saw no more of the plaintiff until he heard "a thud of glass,

it attracted my attention like any wreck would and I turned and looked out the open window and just saw a body about the height of the hood, I would say, and a straw hat coming down, and I recognized it was Mr. Lewis." He was then asked, "Where was that when you looked around and saw it with reference to the pedestrian lane that leads across Liberty on the south side of Chemeketa?" and answered, "I would say— I am just guessing at it—I would say around 18 or 20 feet." He then hurried to the place of the collision. He did not say whether the plaintiff was east or west of the yellow line that marked the center of Liberty street, nor give any details which we have not mentioned. W. D. Edwards was near the intersection when the accident occurred. He immediately rushed to the spot and saw the plaintiff lying "a little east of the center of Liberty" and "betwixt 15 and 20 feet, I judge," south of the pedestrian lane. We have omitted a review of the testimony given by the plaintiff's witnesses concerning the nature of his injuries and resulting disability.

We shall now give a brief review of the testimony given by defendant's witnesses which describes the collision.

Mrs. Esther Croisan testified that at the time of the accident she was driving north on Liberty street, approaching Chemeketa street. At that moment she saw the defendant's car proceeding south along Liberty street at a speed of approximately 15 to 20 miles per hour. At the same time she saw the plaintiff leave the west curb of Liberty street 20 to 25 feet south of the south pedestrian lane of Chemeketa street. Continuing, she testified: "Well, I saw him start across the street and he got nearly to the yellow line and he turned right around and darted back, and I could tell—

I could see this other car coming. If he had turned the other way he would have seen the car, but he turned to the right. If he had turned left he would have seen the car coming. Instead of that—'' At that point she was interrupted by an objection and a ruling which instructed the jury to disregard ''her conclusion of what he could have seen.'' She then continued that when the plaintiff was struck by the car he was walking southwest. The defendant testified that as he approached the intersection, ''I came, if not to a full stop, to practically a full stop, I would say four miles an hour because of the cross traffic on Chemeketa.'' He swore that a car was about 75 feet ahead of him and that two were to his right. According to him, no one was in the south pedestrian lane. He thought that when he reached the south side of the intersection his speed was 12 to 14 miles an hour. When his entire car had cleared the south lane he saw the plaintiff ''walking rather briskly'' in a southwesterly direction near the center line of Liberty street. But he did not see the plaintiff until the latter had ''about long enough for a man to take three rapid steps.'' He swore that he then applied his brakes but that before his car stopped the plaintiff was struck. He thought that the left side of his car was about three feet from the yellow line that marked the center of the pavement. At the time of the accident Mrs. Dorothy Smith was standing on the west side of Liberty street, a few feet south of Chemeketa street. She swore that she was looking into the intersection because she was waiting for her husband to pick her up in his car. Just before the collision she saw a car proceeding west on Chemeketa and turn south into Liberty street. That left-hand turn, according to her testimony, caused the defendant to slow down al-

most to a stop. After he had resumed speed he was going at the rate of about 10 miles an hour as he crossed the south pedestrian lane. She did not see the car strike the plaintiff, but saw the latter as he was thrown in the air. She swore that this happened to the west of the yellow line which marked the center of Liberty street and south of the pedestrian lane, explaining, "If it had been in the pedestrian lane I wouldn't have seen it because I couldn't have seen the pedestrian lane from where I was standing." Mrs. Agnes Chisholm was riding as a guest in the defendant's car, the speed of which she estimated as 12 to 15 miles an hour at the time of the accident, and she swore that she saw the plaintiff immediately before the accident. She gave the following testimony from which we have omitted questions: "He seemed confused, I couldn't tell from looking whether he was going east or west. He turned, yes, when he got in the middle of the street. He turned so his back was toward us. Well, I would say he came from the west side of Liberty and got to the center and then became confused and turned." She swore that the impact occurred about 20 feet south of the pedestrian lane.

From the above it is seen that, although the plaintiff swore he was east of the center line of Liberty street when he was struck, two of his witnesses, Wintersteen and Straw, placed him west of that line. Wintersteen, who did not see the collision, said that the plaintiff lay three feet west of the center line. Straw, who swore that "I either seen the impact or a moment after it happened," thought that the plaintiff when struck was about one-third of the distance to the center line from the west curbstone. Edwards, another witness for the plaintiff, who came to the scene of the accident

shortly after it occurred, said that the plaintiff lay "a little east" of the center line.

We come now to the affidavits which accompany the motion for a new trial. The plaintiff states: "I was so disabled mentally and physically as a result of the collision with defendant's car that I was taken immediately to the hospital where I remained thirty-six days in such a condition that I could not protect myself and learn the names of witnesses who saw the collision; * * *" We pause to observe that evidence presented by the plaintiff supports that statement. For instance, Dr. E. S. Fortner, who attended the plaintiff, testified: "At the time I first saw him he was not quite unconscious but practically so. He answered very sluggishly and incoherently and he had abrasions on his forehead and both hands, his right shoulder, over the shoulder blade, and some bruises to the right elbow, and his nose, I think, was bleeding as I recall, and soon after I first saw him he lapsed into unconsciousness." The unconsciousness lasted for several days. Continuing, the physician said: "When he regained consciousness he seemed to grasp what we were saying to him, but was unable to express himself; in other words, he understood what we were saying and knew what he wanted to say but he couldn't find the word to say it, that is what we in medicine call motoraphasia." Dr. Fortner testified that when the plaintiff left the hospital August 28, 1937, he had recovered partly from this disability, adding, "He is slow now in his speech and quite often has to think and figure out what he wants to say." Dr. V. W. Miller, who testified for the defendant after having given the plaintiff an extensive examination, said, "I don't believe this is motoraphasia." Apparently the plain-

tiff experienced no difficulty in expressing himself as a witness. Continuing, the plaintiff's affidavit says: "After my recovery I made continued and repeated investigations; that I accompanied my counsel, and the two of us interviewed the witnesses whose names were secured by the policeman but were unable to find any other witness who saw the collision and who saw what occurred before." That statement is followed by an account of unsuccessful efforts to trace the whereabouts of two individuals, one of whom was the aforementioned Karl Menger. Next, the affidavit states: "Since the trial I have made continuous further investigations, and by accident found the witness, W. H. Mills, whose affidavit is hereto attached; that I did not know until within the last week that said Mills saw said collision; that I know of no way that I or my counsel could have found Mills prior to the trial * * *. The evidence of the witness Mills is newly discovered evidence since the trial and is highly material to me."

The affidavit of Mills, signed March 26, 1939, gives his age as 50 and describes his occupation as the operator of a logging truck. In it he states that in the late afternoon of the day of the accident he parked his truck on Chemeketa street a few feet west of Liberty. Thus, it was in the immediate vicinity of the plaintiff's car. Continuing, Mills says that after he had parked his truck he walked on the north side of Chemeketa street in an easterly direction and crossed Liberty street. He states that on the west side of Liberty street, a few feet north of the intersection, a large truck was parked with its rear extending towards the center of the pavement. When Mills reached this point, so his affidavit states, he saw the defendant's car traveling south on Liberty approaching Chemeketa

street. We now quote from the affidavit: "It come out around said truck and crossed to a considerable distance east of the center of said street and remained in said position as it was crossing the intersection of Liberty and Chemeketa streets; that as it neared the south side of said intersection it turned sharply in a southwesterly direction and was going in said direction at the time it struck a man in the pedestrian lane travelling west along the south side of Chemeketa street and crossing Liberty street; that as I was crossing said intersection I saw this man leave the sidewalk on the east side of Liberty street and start walking across Liberty street; that he was in the pedestrian lane; * * * before he reached the center of Liberty street and while still in the pedestrian lane this man was struck by the car; * * * I saw that the man was carried several feet and hurled to the pavement; the car continued to go in a southwest direction after the impact; that the point of the impact was east of the center line of Liberty street; that I did not go over to the place of the collision as numerous people gathered around and I was in a hurry to get to the State House * * *."

In an affidavit Allan G. Carson, one of the attorneys for the defendant, states in opposition to the motion for a new trial that on April 5, 1939, he talked with Mills and that "Mills told me that he had seen and talked with the above-named plaintiff for about one-half hour just preceding the time of the accident." Carson further says that when he showed Mills his above affidavit, including the part which declares that at the time of the injury the plaintiff was in the pedestrian lane, Mills said "That is something they shouldn't have put in there. I don't know whether he was in the

pedestrian lane &ast; &ast; &ast;. They are not going to get me in any fix like that—swearing to something I didn't see. I don't know whether he was in the pedestrian lane—he should have been." Further, Carson's affidavit declares: "Said Mills told me that he had, on more than one occasion long prior to the trial of the above-entitled action, talked about the collision in suit with plaintiff's son, Clyde Lewis, who appeared and testified as one of said plaintiff's witnesses at the trial of the above-entitled action, that said Clyde Lewis knew that he, said Mills, had been at the scene of the accident, and was a witness thereof, and that he, said Mills, told said Clyde Lewis that he did not like to get mixed up in such matters, and requested said Clyde Lewis that he, said Mills, not be called as a witness at the trial; that said Mills then and there also told me that he talked with the plaintiff in Corvallis, Oregon, about the collision in question shortly after it had occurred."

Pursuant to agreement between the parties, Mills was produced and was examined under oath while the motion for a new trial was under consideration. He testified that he had known the plaintiff for about four years, adding that at one time he had employed the plaintiff and his two sons. A half hour or so before the accident happened Mills parked his car near the plaintiff's parked car. Thereupon the two engaged in conversation for "some 15 or 20 minutes." At the conclusion Mills walked easterly along the north sidewalk of Chemeketa street intending to go to the State House. When he reached Liberty street he saw the parked truck described in his affidavit and also the defendant's car proceeding south. Concerning it he said: "It wasn't in the right place at all, and I watched

it and it kept on the east side of the street on past, it crossed the intersection of Liberty and turned in a westerly direction, and I saw a man step off the curb, * * * and the next thing I heard was this car hit the man and it drug him, oh, I don't know how far." He said that at that time he did not know that the individual who was struck was the plaintiff. Without stopping he hurried on his way to the State House. The man who was struck was, of course, the plaintiff. Mills swore that the plaintiff was walking westerly. The plaintiff's counsel then asked him whether the plaintiff was in the pedestrian lane when he was struck and Mills answered, "Well, I naturally supposed they were." By the pronoun "they" he referred to the plaintiff, a woman and some children who, he claimed, were also crossing the street. He also swore that when the plaintiff was hit he was east of the center line of Liberty street. Upon cross-examination he said that after the plaintiff had been struck he was dragged along the pavement 15 or 20 feet. Having so declared, he was then asked whether he was in a position to say that at the time of the impact the plaintiff was in the pedestrian lane; he replied, "I would pretty nearly have to say he was." Being pressed further, he answered, "Yes, he was" to a question which inquired "Was he in the pedestrian lane or was he not?" Being reminded of the conversation which he had with Mr. Carson, he said, "Well, he might have been" (that is, in the pedestrian lane) and "I said he was supposed to have been there." He testified that before the case was tried he had talked to Clyde Lewis, the plaintiff's son, about the accident, adding, "That was when I first knew Lewis was hurt" and said that the son on that occasion told him about it. He was then asked, "You told Clyde

you didn't like to get mixed up in a case of this kind, did you not?" and answered, "I had always kept out—" and then was asked, "Did you tell Clyde that?" He replied, "Yes." After having said that upon that occasion "We were just talking about his father being crippled and being hit by a car, is what we talked about," the question was again submitted whether he told Clyde that he "didn't want to get mixed up in it." He replied, "No, I didn't tell him anything." He conceded that after the accident and before the trial he talked several times with the plaintiff, but to a question which inquired whether the conversations concerned the accident, he answered, "No, I wouldn't say we did at all, no, about the accident." He admitted, however, that "he (plaintiff) mentioned something about it, yes, but he was about half out of his head all of the time." He insisted that he did not tell the plaintiff that he had seen the accident occur, but conceded that if the son Clyde had not been expressly so told, nevertheless, he "had a good hunch" to that effect. He swore that he saw no car proceeding west on Chemeketa street and making a left turn into Liberty. He estimated the defendant's speed as 20 to 25 miles an hour. He thought that when the defendant's car came to a stop the plaintiff was lying about four feet from the center line of Liberty street and 20 to 25 feet south of the pedestrian lane. He conceded that he did not see the impact occur. To remove uncertainty, we add that Mills did not go to the plaintiff's assistance following the impact, but hurried on, claiming that he did not know it was the plaintiff who had been struck down.

March 1, 2, 3, 4, 6 and 7, 1939, the plaintiff caused the following advertisement to appear in the Capital

Journal, a daily newspaper published in Salem: "Personal. Notice. The person or persons who saw accident on Chemeketa and Liberty Streets, July 23, 1937, please communicate with F. A. Lewis, Corvallis, Ore., R. 3, 156." The verdict in this action was returned February 17, 1939.

Whether or not that advertisement caused Mills to volunteer his services as a witness has not been disclosed; nor did the plaintiff mention whether or not the advertisement located for him anyone who saw the accident occur. If the plaintiff before the trial advertised for witnesses he has not said so. And, of course, advertising for witnesses was as available before the trial as it was in March, 1939, when actually employed. It will be recalled that the plaintiff's affidavit says that "by accident" he found Mills, and that "I didn't know until within the last week that said Mills saw said collision."

It is seen from the above that Mills' estimate of the defendant's speed was approximately the same as Straw's; that is, 20 to 25 miles an hour. In faltering language he endeavored to place the plaintiff in the pedestrian lane at approximately the same spot where the plaintiff swore he was walking. He agreed with the other witnesses that when the defendant's car came to a stop the plaintiff was lying in front of it, about 20 feet south of the pedestrian lane. But when he swore that the plaintiff was east of the center line of Liberty street, he differed from two of the plaintiff's witnesses—Straw and Wintersteen. Straw, who said, "I either seen the impact or a moment after it happened," placed the scene of the collision well over into the west half of Liberty street. Wintersteen, who did not see the accident occur, but who arrived at its

scene while the plaintiff was still lying on the pavement, said that the plaintiff was lying three feet west of the center line. The only fact that Mills mentioned in addition to the circumstances narrated by other witnesses was the operation of the defendant's car in the east half of the pavement. However, by reverting to the specifications of negligence recited in the complaint, it will be observed that the plaintiff does not charge that the defendant drove his car on the wrong side of the street. Hence, that part of Mills' testimony would be inadmissible upon a retrial.

Section 2-802, Oregon Code 1930, says:

"A former judgment may be set aside and a new trial granted * * * for any of the following causes * * *

"4. Newly discovered evidence, material for the party making the application, which he could not with reasonable diligence have discovered and produced at the trial; * * *"

■■ Motions for new trials based upon claims that additional testimony has been discovered are not favored; to the contrary, they are viewed with distrust. Since they are disfavored and are regarded with suspicion, the courts to which they are addressed scrutinize the record with care before passing upon them. A presumption confronts the moving party that he failed to exercise due diligence before the trial, it being presumed that he would have discovered the evidence in time to have presented it during the trial had he employed reasonable industry. That presumption is founded upon good sense, for common experience teaches us that since virtually everyone regards a lawsuit as a serious matter, litigants generally discover all available witnesses before the trial. But the disfavor

with which a motion for a new trial is regarded is also the product of necessity—the necessity of spurring on the parties to the discovery before trial of all available facts in order that repetitions of the trial may be avoided. These rules have been so many times stated that we shall refrain from doing more in support of our statement of them than to cite the first and last of our decisions in which they were employed: *Lander v. Miles,* 3 Or. 40, and *Wieder v. Lorenz* ante p. 10, 99 P. (2d) 38.

 As a result of the rules above stated, a party is required to call at the trial not only all witnesses of whom he has express knowledge but also all those whom he would have found had he exercised reasonable diligence; that is, he must either call them or forever forego their use. Therefore, all persons of whom he had either express or constructive knowledge cannot be deemed newly discovered witnesses after the trial.

*State v. Evans,* 98 Or. 214, 192 P. 1062, 193 P. 927, cited by the plaintiff, in our opinion, says nothing at variance with the above. The defendant in that case, indicted for a crime committed in Grants Pass September 13, claimed that he was in Medford on that day. After the verdict of guilt he moved for a new trial, asserting that he had newly discovered additional evidence that he was in Medford on September 13. Concerning this, the decision says:

"The testimony of I. A. Snyder, as shown by his affidavit in support of the motion for a new trial, is to the effect that between the time of the defendant's arrest and the trial, the latter had inquired of him if there was any evidence within the affiant's knowledge, aside from the records of the garage, that would show that at the time of the commission of the crime the defendant was at Medford, and he was unable to give

him any information, but since then he has discovered, as the result of investigation made by the affiant Sandry, that there was a transaction in which the defendant was concerned, about the purchase of a vacuum tank from another business house at Medford for the affiant's firm, that would show conclusively that he was at Medford at the time the crime was committed. There is a great wealth of affidavits, along similar lines, of different witnesses who are prepared to give detailed circumstances tending to show that the defendant was at Medford, as he claims, when the crime was committed."

The trial judge denied the motion for a new trial under an erroneous belief that the amendment to Article VII, Section 3, Oregon Constitution, adopted shortly prior thereto, demanded that he do so. In holding that the motion should have been allowed, the opinion stated:

"Although he thus had knowledge of the different transactions detailed, he was not aware of the evidence available to prove them. There is palpable distinction between the existence of a fact and the evidence to prove it to others. * * * As to diligence we find the defendant's case discloses that he was inquiring of his employers about evidence respecting his presence at Medford, and that they disclaimed knowledge of anything in his benefit until after the trial their recollection was refreshed by the investigation of Sandry."

Thus it is apparent that the additional evidence was, in fact, newly discovered and that, although the defendant had exercised diligence before the trial in endeavoring to obtain it, he failed through no fault of his own. A reading of the decision readily indicates that the court was much impressed with the cogency of the newly discovered evidence. We remain satisfied that all persons of whom the loser in the trial had either express or constructive notice cannot be deemed newly discovered after the trial.

█ Mills, as well as the plaintiff, was in Salem on the day of the accident. The two men after parking their cars within a few feet of each other engaged in conversation for a quarter of an hour or more. Whether their coming to the city and parking near one another was pursuant to prior agreement has not been disclosed. At the conclusion of the conversation the plaintiff walked east along the north sidewalk of Chemeketa street to Liberty, and either at the same time or within a few moments of it Mills walked along the same course. Manifestly, Mills did not delay long in proceeding on his way because he was in a hurry to reach the State House—in such a hurry that a moment or two later when he saw a man knocked down and dragged by an automobile he did not pause. It is manifest that if the two men did not walk alongside of one another as they proceeded east on Chemeketa street, they must have been within a few feet of each other. We make that statement because when the plaintiff was injured in or near the south crosswalk of the intersection, Mills was on the northeast corner. Stultz, who remained in the plaintiff's parked car and, possibly, had participated in the conversation, says that he watched the plaintiff walk to the intersection, heard the impact and then, after rushing to the plaintiff's relief, rode with him in the ambulance to the hospital. Thus, not only the plaintiff, but also Stultz, knew that Mills was within a few feet of the scene of the accident at the time of its occurrence. Further, the plaintiff's son, 38 years of age, who testified for the plaintiff at the time of the trial, and who said that he and his father lived "close together," either knew or "had a good hunch," according to Mills, that the latter saw the accident. Since

the son was present at the trial, he was aware of the issues. From 46 C. J., New Trial, p. 255, § 223, we quote:

"Ordinarily a new trial will not be granted for newly discovered evidence which might have been discovered before the trial by inquiry of a coparty, or of a member of applicant's family * * *."

We are satisfied that any reasonably diligent person who was looking for witnesses would, under the circumstances above described, have asked Mills whether he saw the accident take place. According to Mr. Carson's affidavit, Mills said to him that he had "told said Clyde Lewis that he did not like to get mixed up in such matters, and requested said Clyde Lewis that he, said Mills, not be called as a witness at the trial." Clyde Lewis filed no affidavit and neither he nor his father, the plaintiff, contradicted that statement. Mills' effort to contradict the statement was a quibble and most unsatisfactory. The admission to Mr. Carson indicates not only that the plaintiff knew that Mills had seen the accident but also that he had been under consideration as a witness. If Mills did not know that the man dressed in "striped overalls and wearing a straw hat," whom he saw dragged 20 feet by an automobile, was the man in overalls and wearing a straw hat with whom he had talked for a quarter of an hour just before the accident, he knew it when Clyde Lewis told him so some time before the trial. If Mr. Carson's statement that Mills told him that "he did not like to get mixed up in such matters" is untrue, then Mills' silence, when Clyde told him that the man whom he saw dragged by an automobile was his (Clyde's) father and Mills' friend, is contrary to all human experience. Anyone who had seen such an accident take place and who had rushed on, ignorant of the fact that his friend was the victim, would have been astonished upon discover-

ing the facts. Had it not been for Mills' desire not "to get mixed up in such matters," he would have promptly volunteered his services as a witness. We are satisfied that Mr. Carson told the truth and that Clyde knew of Mills' knowledge.

Another explanation for the failure to produce Mills is the following, offered in the plaintiff's brief: "The plaintiff himself is knocked unconscious, his memory is destroyed for weeks and months, he remains substantially a mental wreck after the collision * * *. Months after the collision, he employs counsel. Just what kind of diligence will discover and produce witnesses to a transaction that occurred weeks and months ago." However, we observe that the plaintiff's affidavit, the material parts of which we have quoted, states: "After my recovery I made continued and repeated investigations." Thus, he concedes that he recovered, at least sufficiently to proceed with investigations into the facts of this case. His physician who testified did not claim that the plaintiff's mental processes were so affected that he was unable to think. The physician confined the plaintiff's disability to an occasional impairment of his power of speech. The record does not indicate that the plaintiff experienced any difficulty in locating the witnesses who testified nor in giving his testimony while on the witness stand. As a witness, he said: "I am talking a whole lot better than I could at that time, but I can't always say what I want to."

▪ The plaintiff's affidavit states that it was "by accident" that he discovered that Mills possessed knowledge of the collision. He makes no other explanation and gives no details. He does not even mention the day when the discovery occurred. We are left in the dark

as to whether or not the advertisement quoted in a preceding paragraph or some other means played a part in the discovery. As we have seen, it is presumed that he failed to exercise reasonable diligence before the trial, and that as a result of that failure he remained ignorant of Mills' knowledge—if, in fact, he was ignorant. And as we have also seen, it was his duty to have rebutted that presumption if he was able to do so. That presumption certainly could not be rebutted by a mere avowal that "by accident" he discovered the facts. From *Stern v. Volz*, 52 Or. 597, 98 P. 148, we quote:

"The showing as to reasonable diligence was not sufficient to justify the court to set aside the verdict. The particular efforts which he made, if any, to discover the testimony before the trial, are not stated, nor are any circumstances or names of any persons of whom he made inquiry given, but only that he made 'every effort to find someone' and that 'I went to every one whom I thought might know' which is not sufficient. State v. Hill, 39 Or. 90 (65 Pac. 518)."

Since no explanation has been given, we are compelled to do as the presumption requires; that is, believe that through the failure to exercise reasonable diligence the plaintiff remained ignorant of Mills' knowledge. However, we do not believe that he was actually ignorant.

Without setting forth further analysis, we express our belief that the testimony which the plaintiff proposed to offer from the lips of Mills cannot be deemed "newly discovered evidence" within the contemplation of Sec. 2-802, Oregon Code 1930.

■ Again, 46 C. J., New Trial, p. 268, Sec. 236, says:

"The existence and character of the alleged new evidence must be definitely shown. If the affidavits of-

fered in support of the application are inherently improbable or inconsistent or are rebutted by counter-affidavits * * * a new trial will be refused. Where the newly discovered witness has been impeached by counter-affidavits, or his testimony has been discredited by his conduct a new trial should not be granted.''

■ We have already shown that Mills' version of the accident differs from that given by Wintersteen and Straw. Further, Mills, in variable language, fluttered the plaintiff in and out of the crosswalk, contradicting himself as well as others as he did so. It will also be recalled that Mills swore that he conversed with the plaintiff for 15 minutes or more immediately prior to the accident. The plaintiff testified that he remained in his parked automobile or near to it for three-quarters of an hour looking for the aforementioned Menger before walking to the intersection, but mentioned neither Mills nor the conversation which the latter says took place at that time. If that conversation occurred, it seems remarkable that the plaintiff, who described in some detail the manner in which he parked his car and other incidents, did not mention it. If Mills is right, that conversation consumed a substantial part of the time. Either Mills has been discredited, or, if he is free from discredit, his proposed testimony discredits the evidence already received.

■ The plaintiff argues that a motion for a new trial is addressed to a discretionary power of the circuit court. In this state the statute regulates the practice when the motion is based upon an alleged discovery of new testimony. As we have shown, the demands of the statute have not been met. That being true, the circuit judge had no discretionary power to allow the motion.

For the reasons stated, the motion for a new trial should have been denied. Error was committed when it was allowed. The cause is remanded to the circuit court for the purpose of entering the proper order.

RAND, C. J., and BAILEY and LUSK, JJ., concur.