Argued March 1, affirmed July 1, petition for rehearing denied
July 20, 1976

GRILLO, *Respondent,*

*v.*

BURKE'S PAINT COMPANY, INC., *Respondent,*
E. I. du PONT de NEMOURS AND COMPANY,
*Appellant.*

551 P2d 449

*Cleveland C. Cory,* Portland, argued the cause for appellant. With him on the briefs were Clarence R. Wicks, and Davies, Biggs, Strayer, Stoel and Boley, Portland.

*Edwin J. Peterson,* Portland, argued the cause for respondents. With him on the brief for respondent Burke's Paint Company were E. Richard Bodyfelt, and Tooze, Kerr, Peterson, Marshall & Shenker, Portland; and Ronald L. Miller, Astoria, for respondent Grillo.

Before Denecke, Presiding Justice, and Holman,* Tongue, Howell and Bryson, Justices.

HOWELL, J.

---

*Did not participate in this decision.

**HOWELL, J.**

Plaintiff Grillo, doing business as B-G Paint Co., brought this action for damages against defendant Burke's Paint Company and defendant E. I. du Pont de Nemours (du Pont). Plaintiff had a contract with the State of Oregon to paint the Youngs Bay bridge in Clatsop County. Plaintiff purchased the paint from defendant Burke's, who had mixed it according to specifications which had been supplied to Burke's along with the specified pigment by defendant du Pont. The paint supplied by defendants was defective in that the pigments used were incompatible with each other and the paint turned yellow instead of remaining the required green. As a result, the State of Oregon required plaintiff to repaint the bridge using proper paint. Plaintiff's complaint charged defendant Burke's with breach of warranty and charged defendant du Pont with negligence in failing to discover and warn of the defect. The parties stipulated that plaintiff's damages amounted to $36,500, and a jury returned a verdict against both defendants. Defendant du Pont filed a motion for a new trial which was denied, and defendant du Pont appeals.

Du Pont contends that it was entitled to a new trial on the basis of newly-discovered evidence. Du Pont alleged in its motion that it discovered after the trial that plaintiff and defendant Burke's had entered into an agreement entitled "Loan, Receipt and Covenant Not to Execute" immediately before the trial. It is conceded that this agreement was not made known to counsel for du Pont or to the trial court at the time of trial. The agreement recited the problems with the paint and declared that although plaintiff and Burke's could not agree on the amount of plaintiff's damages, they did agree that the problems with the paint were primarily caused by du Pont's negligent provisions of erroneous formulae and paint ingredients. The agreement then stated:

[ 423 ]

## "LOAN, RECEIPT AND COVENANT NOT TO EXECUTE

"In consideration of the loan of the sum of $16,000 paid to GRILLO, by and in behalf and for BURKE'S, * * * which loan shall be without interest and repayable only in the event and to the extent of any recovery that GRILLO may make from any other person, persons, corporation, corporations, parties, or other legal entities other than BURKE'S on account of or in any way growing out of the afore described events and problems with the described paint, GRILLO covenants * * * to irrevocably bind himself * * * to forever refrain from executing upon or otherwise enforcing * * * any judgment which may hereafter be entered in any court in favor of GRILLO and against BURKE'S and which arises out of the above described claims. * * *

"* * * * *.

## "FUTURE ACTION

"A. GRILLO expressly declares his intent and hereby covenants to prosecute with all due diligence that certain action pending in the Clatsop County Circuit Court for the state of Oregon entitled ROBERT GRILLO dba B-G PAINT COMPANY vs BURKE'S PAINT COMPANY INC. and E. I. DUPONT DE NE MOURS & COMPANY, No. CC 74-211, and shall exercise all reasonable efforts to obtain and collect the judgment, or settlement, in that action or otherwise, for the maximum recoverable damages arising from the above described delays and extra work and damages.

"B. GRILLO hereby covenants and agrees to exercise all reasonable efforts to aid and assist BURKE'S in the successful prosecution of BURKE'S indemnity claims against DUPONT, and GRILLO shall comply in all reasonable respects with requests to that end.

"C. In the event that any sums in excess of $16,000 are recovered (by judgment, settlement or otherwise) by GRILLO from DUPONT, or any other person or entity, in compensation for GRILLO'S damages above described, GRILLO hereby agrees to pay over to BURKE'S $16,000 thereof in repayment of the aforedescribed loan. All such sums recovered which do not exceed $16,000 shall be promptly payable to BURKE'S in par-

tial payment of said loan. BURKE'S shall be vested with a lien in the amount of $16,000 against any and all sums which GRILLO might hereafter recover for said damages, until such time as the $16,000 loan is repaid to BURKE'S."

The above agreement combines the features of a loan agreement with a covenant not to enforce or execute any judgment rendered in favor of plaintiff and against defendant Burke's. The loan is to be repaid only out of the proceeds of a judgment against defendant du Pont. The net effect of the agreement is to limit Burke's liability and to assure plaintiff of a recovery of at least $16,000. Since plaintiff is required to enforce any judgment against du Pont alone and to pay $16,000 of the proceeds thereof over to Burke's in repayment of the loan, the ultimate effect of a judgment for the full amount, $36,500, against both defendants is that du Pont will be forced to pay the entire judgment and Burke's will receive back everything that it has previously paid out. Moreover, under the terms of this agreement, the plaintiff's case against Burke's was not dismissed, and, in fact, Burke's continued to participate throughout the case as a party defendant.

■ Private agreements which constitute a partial settlement of a dispute between a plaintiff and two or more defendants and which retain the settling defendant as a party at the trial have become known as "Mary Carter agreements."[1] Such agreements may take on various forms depending upon the factual setting in an individual case and the underlying law in the particular jurisdiction.

---

[1] "The term arises from the agreement popularized by the case of Booth v. Mary Carter Paint Co., and now appears to be used rather generally to apply to any agreement between the plaintiff and some (but less than all) defendants whereby the parties place limitations on the financial responsibility of the agreeing defendants, the amount of which is variable and usually in some inverse ratio to the amount of recovery which the plaintiff is able to make against the non-agreeing defendant or defendants." Note, *The Mary Carter Agreement—Solving the Problems of Collusive Settlements in Joint Tort Actions,* 47 S Cal L Rev 1393, 1396 (1974).

Mary Carter agreements have been criticized as distorting the relationship between plaintiffs and defendants, resulting in a non-adversary and possibly collusive proceeding between the plaintiff and one defendant which may adversely affect the non-settling defendant's right to a fair trial. *See* Note, *The Mary Carter Agreement—Solving the Problems of Collusive Settlements in Joint Tort Actions,* 47 S Cal L Rev 1393 (1974). *But see Northern Indiana Public Ser. Co. v. Otis,* 145 Ind App 159, 250 NE2d 378 (1969). At least two courts have held such agreements to be void or against public policy. *Trampe v. Wisconsin Telephone Co.,* 214 Wis 210, 252 NW 675 (1934),[2] and *Lum v. Stinnett,* 87 Nev 402, 488 P2d 347 (1971).

However, the majority of jurisdictions which have considered this question do not condemn the agreements as invalid per se but instead require that the agreements be subject to pretrial discovery procedure and be admissible into evidence on request of any non-settling defendant. *See, e.g., Kuhns v. Fenton,* 288 So 2d 253 (Fla 1973); *Ward v. Ochoa,* 284 So 2d 385 (Fla 1973); *Pellett v. Sonotone Corporation,* 26 Cal 2d 705, 160 P2d 783 (1945); Annot., 62 ALR3d 1111 (1975); Note supra at 1409. Such courts generally recognize that an agreement between one of two or more defendants and the plaintiff, whereby the defendant "loans" the plaintiff a certain sum which is to be repaid only to the extent of any recovery against the other defendants, creates a valid and enforceable loan, even when coupled with a covenant not to sue or a covenant not to execute on the settling defendant. *See, e.g., Reese v.*

---

[2]The court stated: "We accept the statement that there was no intention of wrongdoing in these particulars, but the fact still remains that imposition was practiced upon the court, and that it was done by withholding facts which were material and ought to have been disclosed before the trial started. A question of public policy enters here. The deliberate withholding of information of the existence of the settlement of important matters so clearly imposed a fictitious suit upon the court that we are bound to hold that it impeded the regular administration of justice, that it resulted in the trial of issues which were not real, and the action should be dismissed." *Trampe v. Wisconsin Telephone Company,* 214 Wis 210, 252 NW 675, 678 (1934).

*Chicago, Burlington & Quincy R.R.,* 55 Ill 2d 356, 303 NE2d 382 (1973); *American Transport Co. v. Central Indiana Ry. Co.,* 255 Ind 319, 264 NE2d 64 (1970); Annot., *supra* at 1121. *But see Bolton v. Ziegler,* 111 F Supp 516 (ND Iowa 1953); *Cullen v. Atchison, Topeka & Santa Fe,* 211 Kan 368, 507 P2d 353 (1973); *Monjay v. Evergreen School District No. 114,* 13 Wash App 654, 537 P2d 825 (1975).[3] Some courts have even declared that the loan agreements have a salutory effect as they encourage out-of-court settlements and help solve the economic needs of an injured person confronted with the delays in the court system. *Northern Indiana Public Ser. Co. v. Otis, supra; Reese v. Chicago, Burlington & Quincy R. R., supra.*

██ Having reviewed these authorities, we conclude that the loan agreement and covenant not to execute in the instant case is valid and enforceable but that it would have been subject to pretrial discovery and, upon request of defendant, would have been admissible in evidence.[4] However, du Pont made no effort to discover the existence or the terms of the agreement despite the fact that it had been repeatedly informed by Burke's that it intended to settle with plaintiff. Du Pont may not have actually known of the particular kind of settlement which was contemplated, but, under the circumstances of this case, du Pont should

---

[3]The courts in these three jurisdictions have concluded that such agreements are an attempt to circumvent their laws which do not allow contribution or indemnity among joint tortfeasors. Oregon, however, does allow contribution and indemnity, and, therefore, that rationale is inapplicable in this jurisdiction.

[4]Since the trial of this action, a statute has been passed which will apparently require future plaintiffs to disclose the terms of any settlement agreement to all other defendants. *See* ORS 18.455 which states, in part:

"When a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury * * *, the claimant shall give notice of all of the terms of the covenant to all persons against whom he makes claims."

This provision was included in a general statutory revision of the laws pertaining to contribution among joint tortfeasors. *See* Oregon Laws 1975, ch 269. In the present posture of this action, the applicability of the new statute to the facts of this case is not properly before us, and, therefore, we express no opinion as to its effect.

have been aware that Burke's was attempting to protect itself from any and all adverse consequences of this action.

The record indicates that the $16,000 which Burke's loaned to plaintiff in the February 27, 1975, agreement included $5,000 which had previously been paid to plaintiff in 1973. Du Pont concedes that it knew before trial that Burke's had advanced plaintiff the original $5,000. The record also indicates that in October, 1972, during the time plaintiff was having trouble with the paint, Burke's wrote to du Pont explaining the difficulties and stating that it intended to hold du Pont responsible. On June 13, 1973, Burke's again wrote du Pont and informed du Pont that they were "filing a claim with your company for damages." They also gave du Pont an itemization of the damages, and told du Pont that the claim was being given to Burke's insurance company. In August, 1973, Burke's insurance carrier advised du Pont that it was negotiating with plaintiff's attorney and had advanced $5,000 to plaintiff to start repainting the bridge. The carrier also tendered further handling of the claim to du Pont. In November, 1973, Burke's insurance carrier again wrote du Pont:

> "* * * We are continuing our efforts at negotiation with Mr. Bob Grillo, dba B-G Paint Co. The claim is one of considerable magnitude, as you may know. The intent of this letter is to once again formally tender to you the further handling of his claim and at the same time to inform you that should you not move in at this time to effect a settlement, we intend to attempt to conclude one ourselves and then to promptly file an indemnity action against the DuPont Company. * * *."

When Burke's filed its answer to plaintiff's complaint, the answer contained a cross-claim against du Pont for indemnity. Du Pont moved to strike the cross-claim on the grounds that it was premature, and the motion was allowed.[5]

---

[5] *But see* ORS 16.315. This statute has been amended since the trial of this action, and, under the new statute, the cross-claim apparently would not have been premature.

[ 428 ]

■ It is axiomatic that to justify a new trial on the basis of newly discovered evidence the evidence must be such that it could not have been discovered before trial by the exercise of due diligence. *Newbern v. Exley Produce Express,* 208 Or 622, 303 P2d 231 (1956); *Lewis v. Nichols,* 164 Or 555, 103 P2d 284 (1940). *See also* ORS 17.610(4).

■· The record clearly indicates that du Pont knew of the $5,000 advanced to plaintiff by Burke's and had been repeatedly advised that Burke's intended to settle with plaintiff and to file an indemnity action against du Pont. With this information du Pont should have, before trial, inquired of Burke's regarding whether or not they had accomplished the proposed settlement. We conclude that the settlement was a matter that could have been discovered before trial in the exercise of due diligence, and that the trial court did not abuse its discretion in denying du Pont's motion for a new trial on the basis of newly discovered evidence.

Du Pont also contends that the trial court should have entered a partial satisfaction of the judgment in the amount of $16,000, the same sum which Burke's paid to plaintiff pursuant to the loan agreement.

We have already concluded that the loan agreement in this case constituted a valid and enforceable loan even though it is repayable only out of the judgment against du Pont. Under the instant agreement, plaintiff must return the $16,000 to Burke's. When du Pont pays the judgment, plaintiff will secure $36,500, the stipulated amount of damages, and Burke's will receive from plaintiff the full $16,000 loaned under the agreement. Plaintiff is not seeking and will not receive a double recovery. A double recovery would result only if plaintiff were allowed to retain both the $16,000 loan payment and the $36,500 judgment against du Pont. *Compare Starr v. Heckathorne,* 270 Or 238, 527 P2d 401 (1974). We hold that the trial

[ 429 ]

court acted properly in refusing to enter a partial satisfaction of the judgment in this case.

Affirmed.