BUGGE et al,
*Appellants - Cross-Respondents,*

*v.*

FAR WEST FEDERAL BANK, S.B.,
*Respondent - Cross-Appellant,*

PAPE' BROS., INC., et al,
*Defendants.*

(A8610-06422; CA A49858)

785 P2d 1058

Paul R. Meyer, Portland, argued the cause and filed the briefs for appellants - cross-respondents.

Jeffrey J. Bennett, Portland, argued the cause for

respondent - cross-appellant. With him on the brief were Gary E. Rhoades and Bauer, Hermann, Fountain & Rhoades, P.C., Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Plaintiffs appeal from an ORCP 67B judgment for defendant Far West Federal Bank (Far West), assigning as error the granting of Far West's motion for summary judgment on plaintiff's claims of "civil conspiracy," intentional interference with business relationships, "imposition of a constructive trust" and restitution for unjust enrichment. They also assign error to the court's denial of their motions to set aside the judgment and for a new trial. Far West cross-appeals, assigning error to the court's granting of plaintiffs' motion, after entry of the judgment, for leave to file a third amended and supplemental complaint.

We summarize the evidence on summary judgment in the light most favorable to plaintiffs. R. A. Hatch Co. (Hatch Co.), a corporation, is engaged in the construction business and is owned by defendant Robert Hatch (Hatch). In April, 1984, Hatch Co. entered into a security agreement with Far West in connection with Far West's extending it a substantial line of credit. The security agreement granted Far West a lien on all of Hatch Co.'s equipment "either now acquired or hereafter acquired, wherever located and all proceeds thereof." The security interest was perfected by the filing of a financing statement that incorporated the after-acquired property and proceeds found in the security agreement.

In September, 1984, plaintiff William Bugge (Bugge) and Hatch formed Willert Equipment Co., Inc. (Willert), to engage in the business of leasing equipment owned by it. Bugge and Hatch each owned 50 percent of the stock. Bugge was president, and Hatch was secretary.

In January, 1985, Bugge and Hatch Co. entered into a joint venture for the purpose of bidding on an Arizona State Highway project (Redrock). Bugge was not qualified to do business in Arizona, so the joint venture bid on and later entered into the contract in the name of Hatch Co. Fireman's Fund provided a payment and performance bond for Hatch Co. It required that an indemnity agreement be signed by Hatch and Bugge and their spouses.

Hatch Co. needed a mixer for the Redrock job. Willert bought a Caterpillar PVM 2000 Portable Venturi Mixer (asphalt plant) from Pape Bros., Inc. (Pape), a retailer

of Caterpillar equipment, and leased it to Hatch Co. Willert and Pape agreed that Willert would make the down payment in four monthly installments equal to Hatch Co.'s monthly lease payments of $110,000. Hatch and Bugge signed personal guarantees to Pape for Willert's obligation on the asphalt plant.

The asphalt plant did not work properly. Hatch Co. stopped making lease payments to Willert after the second payment, as a result of which Willert was unable to complete the down payment to Pape. In order to enable Willert to do so, Pape loaned Willert $220,000 for the remaining two payments. Pape filed a second lien on the asphalt plant for the additional loan amount.

On July 5, 1985, by a "Letter Agreement," Bugge, Hatch and Hatch Co. retroactively terminated the Redrock joint venture. Pursuant to that agreement, Hatch Co. was to continue to be responsible for the Redrock project and was to have all of the rights and assume all of the obligations related to it. Bugge was to work for Hatch Co. as the project's general manager. In a contemporaneous redemption agreement among Bugge, Willert and Hatch, Willert agreed to purchase Bugge's shares of Willert stock. Paragraph 2 of the agreement required Willert to pay Bugge $24,000 for the stock on or before September 15, 1985. The agreement also provided:

"4. *Escrow Agreement.* As security for the payment of the purchase price referred to in paragraph 2, the corporation concurrently herewith has deposited with _____, as escrow agent, all of the shares of the corporation purchased hereunder, duly endorsed in blank for transfer. *If the corporation shall default in the payment of the purchase price and such default shall continue for ten (10) days the escrow agent shall, at seller's request, offer at public sale all the shares of the corporation deposited with him.* Notice of foreclosure and all other statutory requirements are waived by the corporation, to the extent permitted by law, except that the escrow agent shall give the corporation ten (10) days prior notice of the time and place of sale. The seller may purchase the shares at such sale. The proceeds of sale shall be applied first to pay the expenses of conducting such sale, including reasonable fees incurred in connection therewith and then to pay any sums due from the corporation to the seller. Any surplus then remaining shall be paid to the corporation. *Upon payment in full of the purchase price, the escrow*

*agent shall return all of the shares deposited with him to the corporation without any notice of further consent from the seller. So long as the corporation is not in default under this agreement or in the payment of the purchase price it shall exercise and enjoy all the rights accruing from the ownership of the shares.* Notwithstanding the foregoing, as long as any of the purchase price is unpaid, the corporation shall not issue any new or additional shares, shall not incur any indebtedness except in the regular course of business, and shall not make any dividends or other distribution to its shareholders.

"* * * * *

"7. *Other Obligations of Corporation.* The corporation is indebted to seller in the amount of $92,978.78. On or before September 15, 1985, the corporation shall pay such indebtedness to seller, without interest. In the event payment is not made by September 15, 1985, the indebtedness shall bear interest from July 5, 1985, until paid in the amount of _____% per annum.

*"The corporation, or a person or entity acting in behalf of the corporation agrees to refinance all equipment rentals or purchases of the corporation or remove the seller from any individual guarantee in connection therewith on or before October 1, 1985.* In addition, the corporation shall indemnify and hold harmless the seller from any and all individual liabilities in connection with bonds issued in behalf of the corporation where the seller is an indemnitor." (Emphasis supplied.)

Thus, under paragraphs 2 and 7, Willert agreed to purchase Bugge's Willert stock by September 15, and to refinance all of the equipment or to remove the Bugges from the individual guarantees by October 1.

The second emphasized portion of the agreement can be read in only one way: Willert was required to perform *all* of its obligations under the redemption agreement before it could exercise ownership rights in the stock. That would include its obligations under paragraph 7 to refinance the equipment or to remove the Bugges as guarantors. Willert did not fulfill any of its obligations under the agreement.

Hatch Co. did not pay two suppliers of materials on the Redrock job. In October, 1985, Fireman's Fund notified Bugge that it had received claims from those suppliers in the total amount of $496,000. After receiving that notice, Bugge

met with Hatch, who assured him that he would pay the claims. He failed to do so, and Fireman's Fund eventually obtained judgments against plaintiffs under their agreement to indemnify it.

Hatch, as president of Willert and Hatch Co., pursued a claim against Pape with regard to the defective asphalt plant. After extensive negotiations, Pape sent Hatch, as president of Willert, a letter proposing a settlement, dated December 9, 1985, signed by Mitchell, Pape's sales representative. The letter was then signed by Hatch. It is, in essence, a summary of an agreement reached by telephone between Hatch and Pape. It is cryptic, and its terms cannot be understood fully without reference to other evidence. Hatch testified that the letter expressed a plan for Willert's refinancing of the asphalt plant by Pape's finance company, Industrial Finance Co., under terms highly favorable to Willert. Additionally, Pape was to make available a PR1000 rotomill worth $560,000, for which Willert would pay $100,000 cash and trade a 966D Wheel Loader, which the evidence shows was owned by Hatch Co., worth approximately $80,000. Pape was to pay Willert $94,000 cash. Willert was to realize a net benefit from the transaction of approximately $475,000. Although the letter does not expressly so state, both Hatch and Pape's financial manager testified that it was their intention that *Willert,* not Hatch Co., receive the rotomill. The December 9 letter also listed Bugge as a guarantor on the new loan for a maximum of $300,000, although Bugge had not yet seen the letter or agreed to assume that obligation.[1]

On December 16, 1985, the parties executed a "Settlement and General Release," signed by Hatch, individually and as president of both Hatch Co. and Willert, and by representatives of Caterpillar, Pape and CMI. It provided:

> *"Robert A. Hatch, R. A. Hatch Co., and Willert Equipment Co., Inc., (hereinafter collectively referred to as 'Hatch'),* in consideration of a price discount for the purchase by Hatch of a certain Caterpillar PR 1000 rotomill, * * * for $100,000.00 cash and the trade in of one Caterpillar 966D Wheel Loader, * * * and in consideration of Caterpillar Tractor Co. ('Cat'),

---

[1] Plaintiffs refer to the letter as the "December 9 Agreement." It is clear that the proposed agreement summarized by the letter was contingent at least on Bugge's agreeing to guarantee the loan up to $300,000.

Pape Bros., Inc., ('Pape') and CMI Corporation ('CMI') making available for Hatch $1,360,000.00 in new financing for the equipment shown on Exhibit A [the asphalt plant], * * * hereby releases, discharges, and holds harmless Cat, Pape, and CMI * * * from any and all claims * * * connected with [the asphalt plant]." (Emphasis supplied.)

That agreement embodies the "release" component of the parties' agreement, but it is no more specific as to the terms of the refinancing of the rotomill than is stated in the paragraph quoted above. For the purpose of stating rights and obligations, the agreement does not distinguish between Hatch, Hatch Co. and Willert and expressly refers to all three collectively as "Hatch." Similarly, it provides that "Hatch," presumably using the collective name, is to receive the rotomill; the agreement is, in that respect at least, ambiguous. On December 16, Bugge signed companion documents that were necessary to provide his guarantee for the new financing. Hatch and Bugge testified that, despite the absence of an express statement to that effect, the December 9 settlement proposal letter and the December 16 agreement were intended by Bugge, Willert and Hatch to produce funds *for Willert* to pay off the Redrock obligations and thereby relieve plaintiffs of their indemnity obligations to Fireman's Fund. Willert was to sell the rotomill to a third party and use the proceeds to pay off those claims.

By December 5, 1985, the loans extended by Far West to Hatch Co. and other Hatch entities exceeded $6,000,000; payments were not current. Far West had been discussing the matter with Hatch for at least six months and had determined that a restructuring of the loan was necessary.

On December 20, 1985, on Hatch's instructions, Mitchell (of Pape) prepared an invoice for the rotomill, showing a "cash sale" to Hatch Co. as purchaser. On January 31, 1986, Hatch Co. sold the rotomill to a third party, who financed the purchase through Far West. Far West seized the proceeds of the sale, purportedly based on its April, 1984, security interest in Hatch Co.'s equipment and proceeds, and used the funds to reduce Hatch Co.'s outstanding loan balance.

Plaintiffs' complaint alleged four separate "claims"

against Far West: (1) Far West had engaged in a civil conspiracy with Hatch to acquire the proceeds of the rotomill; (2) it had interfered with plaintiffs' business relationships and contractual rights by preventing Hatch Co. from indemnifying and holding plaintiffs harmless under the July 5, 1985, agreement, and by asserting, without any basis in fact, its security interest in the rotomill and its proceeds, thereby interfering with Willert's *and Bugge's* December 9 letter "agreement" and the December 16 agreement regarding the disposition of the rotomill proceeds; (3) by reason of the foregoing, Far West received the proceeds of the rotomill when it should not have, justifying the imposition of a constructive trust; or, alternatively, (4) plaintiffs were entitled to restitution for unjust enrichment. The trial court granted summary judgment for Far West on each claim. Plaintiffs contend on appeal that there are issues of material fact, making summary judgment improper.

 Plaintiffs' first argument is that there are questions of fact concerning whether the December 20 invoice purporting to transfer the rotomill to Hatch Co. was sufficient to pass legal title to Hatch Co. and that, therefore, there is a question of fact whether Far West had a legal right to the proceeds of the rotomill.[2] We agree that whether Hatch Co. acquired title to the rotomill is a question of fact. Ownership of nontitled property is not determined by the invoice alone, but by the intentions of the parties as expressed in the contract of sale. *See Keegan et al. v. Lenzie,* 171 Or 194, 135 P2d 717 (1943);

---

[2] Far West contends that plaintiffs have made a judicial admission that the invoice was sufficient to transfer title to the rotomill. Paragraph 14 of the second amended and supplemental complaint alleges:

"On or about December 20, 1985, Pape, in breach of the December 9, 1985, agreement, conveyed the Caterpillar PR 1000 rotomill to Hatch Co., instead of to Willert, which caused the blanket security agreement held by Far West on all of Hatch Co. equipment instantaneously to attach to said piece of equipment * * *."

Far West contends that that allegation constitutes an admission of fact that should be considered conclusive with regard to the legal effect of the invoice. *Ralston v. Spoor,* 39 Or App 883, 885, 593 P2d 1285, *rev den* 287 Or 149 (1979). The allegation is not an admission of fact, but a legal conclusion that is not binding on the party or the court. As we have held, the documents concerning the transfer of the rotomill are ambiguous, and it remains to be determined, as an issue of fact, whether the parties intended that the title to the rotomill be taken by Hatch Co. or by Willert. In view of our holding on that issue, we need not reach the merits of the issue raised by Far West's cross-appeal: Did the trial court err by permitting plaintiffs to file a third amended and supplemental complaint deleting paragraph 14 almost one month after entry of the judgment?

*Stone v. First National Bank,* 100 Or 528, 193 P 1023, 197 P 304, 198 P 244 (1921). There is testimony that the parties to the December 9 letter and the December 16 agreement believed that the rotomill would be transferred to Willert, rather than to Hatch Co. Because the documents themselves are ambiguous in that they do not state explicitly to whom the rotomill was to be transferred, the determination of that issue is a question of fact. However, we conclude that it is not a *material* question of fact with respect to the claims of conspiracy, because other essential elements of that claim are missing.

■ In order for plaintiffs to establish a conspiracy between Far West and Hatch to misappropriate proceeds of the rotomill, there must be evidence of concerted action to accomplish an unlawful purpose. *Bonds v. Landers,* 279 Or 169, 194, 566 P2d 513 (1977). Here, there is no evidence that Far West agreed or worked with Hatch to effectuate the transfer of the rotomill to Hatch Co. or to secure the proceeds. There is evidence that, by late December, 1985, Far West knew of the existence of the December 9 letter and also knew of the dispute between Bugge and Hatch concerning whether Willert had fulfilled its obligations under the July 5 indemnity agreement. That evidence is not sufficient to prove a conspiracy between Far West and Hatch, however. In fact, the evidence indicates, without contradiction, that, whether Willert or Hatch Co. was to receive the rotomill, Hatch intended to use the proceeds from its sale to pay off the Redrock claims. The only evidence is that, when it acquired the proceeds, Far West acted contrary to Hatch's own expressed intention. There was no evidence of a conspiracy.

■ To establish a claim for interference with business relationships, plaintiffs must show "[e]ither the pursuit of an improper objective of harming plaintiff[s] or the use of wrongful means that in fact cause injury to plaintiff[s'] contractual or business relationships." *Top Service Body Shop v. Allstate Ins. Co.,* 283 Or 201, 205, 582 P2d 1365 (1978). There is evidence that Far West, through McCall, its vice president, was probably aware that, by virtue of his earlier guarantees, Bugge had an interest in seeing that Willert, rather than Hatch Co., acquired title to the rotomill so that the proceeds from its sale would not be subject to Far West's security interest but would

be available to pay off the Redrock claims. There is no evidence that Far West participated in the purported transfer of the rotomill to Hatch Co. or, as plaintiffs claim, that Far West "leaned on Hatch as a condition to the restructuring of his finance [sic] to include Willert and the Roto Mill in the refinancing package as a condition to his getting any refinancing whatsoever." In fact, the only evidence is to the contrary: Far West was not interested in the rotomill, because it believed that Willert would acquire it, and Far West became aware of its potential security interest in the rotomill only after the equipment was "invoiced" to Hatch Co. The only evidence is that, when Far West finally took action to secure the proceeds of the rotomill, it believed that the rotomill had actually been transferred to Hatch Co. by the invoice, as *all* of the parties to this case believed at that time. However, in view of the ambiguities in the December 9 letter and the December 16 agreement as to whom was to receive the rotomill, whether the actions that Far West took thereafter in seizing the proceeds were taken reasonably with the legitimate business motive of obtaining funds in which it reasonably believed it had a security interest presents questions of fact. *See Lewis v. Oregon Beauty Supply Co.,* 302 Or 616, 733 P2d 430 (1987). Therefore, the court erred in granting summary judgment to Far West on the claim of interference with business relationships.

■ The trial court also granted summary judgment on the "claim" for the imposition of a constructive trust on the proceeds of the rotomill. As we have held, the invoice, in and of itself, is not sufficient to determine the ownership of the rotomill, especially in view of the ambiguities surrounding the December 9 letter and the December 16 agreement. The question of the intended ownership remains to be decided. There is evidence from which it could be found that the parties to both documents intended that Willert, not Hatch Co., was to receive the rotomill, so that the proceeds could be used to pay claims arising out of the Redrock joint venture, which, in turn, would have relieved plaintiffs of their obligation to Fireman's Fund, among others. There is also evidence from which it could be found that the Bugges were intended third-party beneficiaries of the December 16 agreement, as well as creditor beneficiaries. If a jury were to find those facts, Far West would not have acquired a security interest in the rotomill as a

matter of law, and plaintiffs would have some claim to the proceeds. We are not persuaded, however, that the imposition of a constructive trust would be the appropriate remedy in those circumstances. Where, as here, only a money judgment is sought and there is no specific property identified as belonging to plaintiffs, it is improper to impose a constructive trust. *Derenco v. Benj. Franklin Fed. Sav. and Loan,* 281 Or 533, 558, 577 P2d 477, *cert den* 439 US 1051 (1978). The proper remedy is restitution for unjust enrichment, which is plaintiffs' fourth claim.

■ As we have stated, there is evidence that would permit a jury to find that Far West did not obtain a valid security interest in the proceeds of the rotomill. If it did not, it has been unjustly enriched by obtaining the proceeds and should, in equity and good conscience, return them to the intended recipient, Willert. *Derenco v. Benj. Franklin Fed. Sav. and Loan, supra,* 281 Or at 558. Plaintiffs, as third-party beneficiaries of the December 16 agreement, would have standing to seek restitution for Willert. Accordingly, the case is remanded for trial on plaintiffs' restitution claim.

■ Plaintiffs' fifth assignment is that the trial court erred in failing to grant a motion for new trial on the first two claims on the ground that plaintiffs had newly discovered evidence. ORCP 64B(4). The alleged new evidence consists of an affidavit by Hatch contradicting his previous affidavit concerning the motivation for his decision to tell Pape to transfer the rotomill to Hatch Co. rather than to Willert. We cannot say that the trial court acted outside the permissible range of its discretion in denying the motion on the ground that the evidence could have been discovered before the summary judgment hearing. *See Grillo v. Burke's Paint Co.,* 275 Or 421, 551 P2d 449 (1976).

On appeal, reversed and remanded on plaintiffs' restitution and intereference with business relationship claims; otherwise affirmed on appeal and cross-appeal.